ORIGINAL

William A. Nebeker, Esq. CA State Bar No. 72079
Sharon A. Huerta, Esq. CA State Bar No. 186998
KOELLER NEBEKER CARLSON & HALUCK, LLP
225 Broadway, Suite 2100
San Diego, California 92101
Telephone: (619) 233-1600
Facsimile: (619) 236-0527
*Sharon.Huerta @ knclaw.com*

Treva J. Hearne, Esq., CA State Bar No. 159542
HAGER & HEARNE
245 E. Liberty - Suite 110
Reno, Nevada 89501
Tel: (775) 329-5811
Fax: (775) 329-5819

*Co-Counsel for Plaintiffs*

FILED
CLERK, U.S. DISTRICT COURT

JUL 27 2009
12:53

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE CENTRAL DISTRICT OF CALIFORNIA**

FAXED

ALFONSO VARGAS, a married man,
OCTAVIO VILLALVA, a married man, and
LUIS CARLOS MARTINEZ, a married man,
individually and on behalf of a class of
similarly situated individuals,

Plaintiff,

vs.

COUNTRYWIDE HOME LOANS, INC., a
New York corporation, dba AMERICA'S
WHOLESALE LENDER; MERSCORP, INC.,
a Virginia corporation; MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS,
INC., a subsidiary of MERSCORP, Inc., a
Delaware corporation; FEDERAL HOME
LOAN MORTGAGE CORPORATION, a
Virginia corporation; FEDERAL NATIONAL
MORTGAGE ASSOCIATION, a District of
Columbia corporation; GMAC MORTGAGE,
L.L.C., a Delaware corporation; NATIONAL
CITY MORTGAGE, a foreign company and a
division of NATIONAL CITY BANK, a
subsidiary of National City Corporation;
NATIONAL CITY CORPORATION, a
Delaware corporation and a subsidiary of PNC
Financial Services, Inc.; PNC FINANCIAL
SERVICES, INC., a Pennsylvania corporation;
J.P. MORGAN CHASE BANK, N.A., a New
York corporation; CITIMORTGAGE, INC., a

Case No.: CV09-2309 SJO (CWx)

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **Violation of Truth in Lending Act, 15 U.S.C. § 1601, et seq.**

2. **Violation of Home Ownership and Equity Protection Act, 15 U.S.C. §§ 1602(aa), 1610, and 1639**

3. **Violation of Fair Housing Act, 42 U.S.C. § 3601, et seq.**

4. **Violation of California Civil Code § 1632 (Translation Act);**

5. **Violation of California Business and Professions Code § 17200**

6. **Conspiracy to Commit Fraud and Conversion**

7. **Conspiracy to Commit Fraud Related to MERS System**

8. **Unjust Enrichment**

9. **Intentional Infliction of Emotional Distress**

1

Amended complaint

**CLASS ACTION COMPLAINT**

New York corporation; HSBC MORTGAGE CORPORATION, U.S.A., a Delaware corporation; AIG UNITED GUARANTY CORPORATION, a foreign corporation; WELLS FARGO BANK, N.A., a California corporation, dba WELLS FARGO HOME EQUITY and dba WELLS FARGO HOME MORTGAGE, a division of WELLS FARGO BANK, N.A., a California corporation; BANK OF AMERICA, N.A., a Delaware corporation, GE MONEY BANK, an Ohio corporation; HOME CAPITAL FUNDING, a California corporation; MORTGAGEIT, INC., a New York corporation; DEUTSCHE BANK, a New York corporation; JOHN AND JANE DOES I-X; BLACK AND WHITE PARTNERSHIP I-X; AND ABC CORPORATION I-X;

                    Defendants.

**10. Fraud in the Inducement**

**11. Injunctive Relief**

**12. Declaratory Relief**

**13. Class Action Claim for Violation of California Business and Professions Code § 17200**

**JURY TRIAL DEMANDED**

Plaintiffs, individually, and on behalf of a class of similarly situated individuals, through undersigned counsel, for Plaintiffs' complaint against Defendants, allege as follows:

## JURISDICTION

1.      Jurisdiction is founded upon 28 U.S.C. § 1331, as this matter presents issues of federal law, and this court has jurisdiction over the subject matter of this action pursuant to the laws of the United States, including but not limited to, 15 U.S.C. § 1601, et seq.; 42 U.S.C. § 3601, et seq.; and 15 U.S.C.§ 1640.

2.      This court also has jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship, as Plaintiffs are residents of the state of California; Defendant Countrywide Home Loans, Inc. is a New York corporation doing business as America's Wholesale Lender; Defendant MERSCORP, Inc. is a Virginia corporation, and its subsidiary, Defendant Mortgage Electronic Registration Systems, Inc. is a Delaware corporation; and Defendants Federal Home Loan Mortgage Corporation, Federal National Mortgage Association; GMAC Mortgage, L.L.C.; National City Mortgage; National City Corporation; PNC Financial Services, Inc.; J.P. Morgan Chase Bank, N.A.; CitiMortgage, Inc.; HSBC Mortgage Corporation, U.S.A.; Bank of America, N.A.; AIG United Guaranty Corporation; Wells Fargo Bank, N.A. dba Wells Fargo Home Equity; Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.; GE Money Bank,

Amended complaint

1    Mortgagelt, Inc. and Deutsche Bank are foreign corporations, and because this matter is a class

2    action with claims having a value in excess of $5,000,000.00.

3         3.     This court has pendent jurisdiction over Plaintiffs' state law claims pursuant to 28

4    U.S.C. § 1367.

5         4.     Venue over this matter is appropriate in this court pursuant to 28 U.S.C. § 1391(b).

6    The acts complained of occurred, in substantial part, in the state of California, the property

7    subject to this action is situated in California, the owners of the property reside in California, and,

8    at all relevant times material hereto, the Defendants are or were doing business in California.

9                                        **Parties and Standing**

10        5.     Plaintiff, Alfonso Vargas, is a resident of Los Angeles County, California.

11        6.     At all times relevant and material hereto, Plaintiff Vargas maintained Plaintiff's

12   primary residence in Los Angeles County, California with the legal description of:

13                  LOT 29, OF TRACT NO. 17801, IN THE CITY OF POMONA,
                    COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS

14                  PER MAP RECORDED IN BOOK 437, PAGE(S) 37 TO 41
                    INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY

15                  RECORDER OF SAID COUNTY. EXCEPT THEREFROM ALL
                    OIL, GAS, MINERALS, AND OTHER HYDROCARBONS, BUT

16                  WITHOUT THE RIGHT OF SURFACE ENTRY THEREON, AS

17                  RESERVED IN INSTRUMENTS OF RECORD. PARCEL ID NO:
                    8354-030-017.

18

19   Plaintiff Vargas's primary residence as described above is commonly referred to and located at

20   2222 Laurel Avenue, Pomona, California (hereinafter referred to as "Vargas Residence").

21        7.     Plaintiff, Octavio Villalva, is a resident of Los Angeles County, California.

22

23        8.     At all times relevant and material hereto, Plaintiff Villalva maintained Plaintiff's

24   primary residence in Los Angeles County, California with the legal description of:

25                  LOT 542 OF TRACT NO. 5780, IN THE CITY OF LOS ANGELES,

26                  COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER
                    MAP RECORDED IN BOOK 66 OF PAGES 91 TO 95 INCLUSIVE OF

27                  MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
                    COUNTY. EXCEPT THE EAST 40 FEET THEREOF. COMMONLY

28                  [REFERRED] AS:  2802 POTOMAC AVENUE, LOS ANGELES, CA

**FIRST AMENDED CLASS ACTION COMPLAINT**

90016

ALSO EXCEPT ANY DEPOSITS OF OIL, GAS OR OTHER HYDROCARBON SUBSTANCES AND WATER UNDERLYING SAID LAND. PARCEL ID NO: 5057-007-003.

Plaintiff Villalva's primary residence as described above is commonly referred to and located at 2802 Potomac Avenue, Los Angeles, California (hereinafter referred to as "Villalva Residence").

9.     Plaintiff, Luis Carlos Martinez, is a resident of San Bernardino County, California.

10.     At all times relevant and material hereto, Plaintiff Martinez maintained Plaintiff's primary residence in San Bernardino County, California, with a parcel identification number of 0281-354-02-0-000 and a street address of 2876 South Cypress Point Drive, Ontario, California.

11.     Upon information and belief, Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender ("Countrywide") was a New York corporation authorized to do business in and doing business in Los Angeles County, California, and at all times material hereto was a member of the MERS system described herein and a shareholder in MERSCORP, INC.

12.     Upon information and belief, Defendant MERSCORP, INC. was a Virginia corporation and doing business in Los Angeles County, California through its subsidiary, Defendant MERS, Inc., a Delaware corporation.   Upon information and belief, MERSCORP, INC. was a director of MERS, Inc.   Defendants MERSCORP, INC. and MERS, Inc. are hereinafter collectively referred to as "MERS."

13.     Upon information and belief, Defendant Federal Home Loan Mortgage Corporation (hereinafter referred to as "Freddie Mac") is a Virginia corporation doing business in California, and a shareholder in MERSCORP, INC.   Upon information and belief, Freddie Mac was also, through its agents and employees, a director of MERSCORP, INC. and/or MERS, Inc.

14.     Upon information and belief, Defendant Federal National Mortgage Association (hereinafter referred to as "Fannie Mae") is a District of Columbia corporation doing business in California and, at all times material hereto, was a shareholder of MERSCORP, INC. and a

4

1    member of the MERS system described herein.  Upon information and belief, Defendant Fannie

2    Mae was also, through its agents and employees a director of MERSCORP, INC. and or MERS,

3    Inc.

4        15.    Upon information and belief, Defendant GMAC Mortgage, L.L.C. was a Delaware

5    corporation doing business in California and, at all times material hereto, was a member of the

6    MERS system described herein.  Upon information and belief, Defendant GMAC Mortgage,

7    L.L.C., through its affiliate or subsidiary, GMAC Residential Funding Corp., was a shareholder in

8    MERSCORP, INC., and through its employees or agents employed by its affiliate or subsidiary,

9    GMAC Residential Holding Corp., was a director of MERSCORP, INC. and/or MERS, Inc.

10       16.    Upon information and belief, PNC Financial Services Group, Inc. (hereinafter

11   "PNC") is a Pennsylvania corporation and the parent company of National City Corporation, Inc.

12   pursuant to a merger consummated in or around December 31, 2008 and a member of the MERS

13   system described herein.

14       17.    Upon information and belief, National City Corporation, (hereinafter "National

15   City Corp.") is a Delaware corporation wholly owned by PNC pursuant to a merger consummated

16   in or around December 31, 2008 and a member of the MERS system described herein.

17       18.    Upon information and belief, National City Bank (hereinafter "National City

18   Bank"), is an Ohio corporation wholly owned by PNC pursuant to a merger consummated in or

19   around December 31, 2008 and a member of the MERS system described herein.

20       19.    Upon information and belief, Defendant National City Mortgage, a division of

21   National City Bank, was a foreign company doing business in California, and, at all times

22   material hereto was a member of the MERS system described herein.  Upon information and

23   belief, Defendant National City Mortgage, through its agents and employees, is or was a director

24   of MERSCORP, INC.

25       20.    Upon information and belief, Defendant J.P. Morgan Chase Bank, N.A. was a New

26   York corporation doing business in California and, at all times material hereto, was a member in

27   the MERS system described herein.  Upon information and belief, J.P. Morgan Chase Bank, N.A.,

28   through its affiliate or subsidiary, Chase Home Mortgage Corporation of the Southeast, was a

**FIRST AMENDED CLASS ACTION COMPLAINT**

1    shareholder in MERSCORP, INC., and through its employees or agents employed by its affiliate,

2    J.P. Morgan Chase Co., was a director of MERSCORP, INC. and/or MERS, Inc.

3        21.    Upon information and belief, Defendant CitiMortgage, Inc. was a New York

4    corporation doing business in California and, at all times material hereto, was a member in the

5    MERS system described herein and a shareholder of MERSCORP, Inc.

6        22.    Upon information and belief, Defendant HSBC Mortgage Corporation, U.S.A. was

7    a Delaware corporation doing business in California and, at all times material hereto, was a

8    member of the MERS system described herein.  Upon information and belief, HSBC Mortgage

9    Corporation, through its affiliate or subsidiary HSBC Finance Corp., was a shareholder of

10   MERSCORP, INC.

11       23.    Upon information and belief, Defendant Wells Fargo Bank, N.A. was a California

12   corporation doing business in California as Wells Fargo Home Equity and as Wells Fargo Home

13   Mortgage, a Division of Wells Fargo Bank, N.A., and, at all times material hereto, was a member

14   of the MERS system described herein and a shareholder of MERSCORP, INC.

15       24.    Upon information and belief, Defendant Bank of America, N.A. was a foreign

16   corporation doing business in California, and was a successor in interest to Countrywide Home

17   Loans, Inc. and/or acquired Countrywide Home Loans, Inc. and its affiliates and subsidiaries,

18   including America's Wholesale Lender, for the purpose of funding and/or managing the ongoing

19   business activities of Countrywide Home Loans, Inc.  Upon information and belief, Defendant

20   Bank of America, N.A., at all times material hereto, was a member of the MERS system

21   described herein.

22       25.    Upon information and belief, Defendant AIG United Guaranty Corporation was a

23   foreign corporation doing business in California and, at all times material hereto, was a

24   shareholder of MERSCORP, INC. and/or a member of the MERS system described herein.

25       26.    Upon information and belief, Defendant GE Money Bank was an Ohio corporation

26   doing business in California and was a member of the MERS system described herein.

27       27.    Upon information and belief, Defendant Home Capital Funding was a California

28   corporation doing business in California and was a member of the MERS system described

**FIRST AMENDED CLASS ACTION COMPLAINT**

herein.

28.     Upon information and belief, Defendant Deustche Bank was a New York corporation and the parent company of MortgageIt, Inc.

29.     Upon information and belief, Defendant MortgageIt was a member of the MERS system described herein and a subsidiary of Deutsch Bank.

30.     Defendants John and Jane Does I-X are fictitious names for affiliates, agents, or successors or assigns of the named Defendants whose true names are not known to Plaintiff at this time.  Plaintiff will seek leave of court to amend this complaint to assert the true names of these Defendants at such times as their true names are discovered to assert this complaint against such parties with the same effect as if such names had been set forth herein.

31.     Defendants Black and White Partnership I-X are fictitious names for affiliates, partners, or successors or assigns of Defendants whose true names are not known to Plaintiff at this time.  Plaintiff will seek leave of court to amend this complaint at such times as their true names are discovered to assert this complaint against such parties with the same effect as if such names had been set forth herein.

32.     Defendants ABC Corporation I-X are fictitious names for affiliates, partners, or successors or assigns of Defendants whose true names are not known to Plaintiff at this time. Plaintiff will seek leave of court to amend this complaint to assert the true names of these Defendants at such times as their true names are discovered to assert this complaint against such parties with the same effect as if such names had been set forth herein.

## GENERAL ALLEGATIONS

### As to Plaintiff Vargas

33.     On or about January 12, 2006, Plaintiff Vargas refinanced the Residence referred to herein in Los Angeles County, California, by executing a Note and Deed of Trust in favor of America's Wholesale Lender as Lender, with MERS, Inc., listed as the Beneficiary on the Deed of Trust in the principal amount of $308,000.00.  The Note and Deed of Trust are hereinafter referred to as the "First Mortgage."  The purpose of Plaintiff refinancing his Residence was to lower his interest rate and to lower his payment on his existing first and second mortgages.  A

7

1  copy of the Note and Deed of Trust comprising the First Mortgage are attached to this Complaint as

2  Exhibit 1.

3      34.    On or about January 19, 2006, as part of his refinancing the Residence, Plaintiff

4  executed a Home Equity Credit Line Agreement and Disclosure Statement (hereinafter referred to

5  as the "HELOC Agreement") secured by a Deed of Trust in favor of America's Wholesale Lender

6  as Lender, with MERS, Inc. listed as the Beneficiary, in the principal amount of $38,500.00. The

7  HELOC Agreement and the Deed of Trust securing it are hereinafter referred to as the "Second

8  Mortgage." A copy of the HELOC Agreement and the Deed of Trust securing it are attached as

9  Exhibit 2.

10     35.    America's Wholesale Lender is a subsidiary or affiliate company of Countrywide

11  Home Loans, Inc.

12     36.    Prior to executing the First and Second Note and Deed of Trust, Plaintiff applied

13  for a loan through representatives of Cabrillo Mortgage and Realty Services. Cabrillo Mortgage

14  and Realty Services, upon information and belief, was acting as an agent of Defendant

15  Countrywide Home Loans, Inc. and/or America's Wholesale Lender.

16     37.    Plaintiff did not sign the application at the time it was filled out by the Cabrillo

17  Mortgage and Realty Services representative, and he was not provided a copy to review prior to

18  the application being submitted to Countrywide Home Loans, Inc. or America's Wholesale

19  Lender.

20     38.    Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender,

21  through its agent Cabrillo Mortgage and Realty Services, before the Plaintiff executed the

22  documents related to the First and Second Mortgages, represented to Plaintiff that the interest rate

23  on the loan secured by the First Deed of Trust would equal 1.5 percent, subject to adjustment,

24  with monthly payments initially being equal to $1,062.97.

25     39.    The monthly payments referred to in the preceding paragraph were 26 percent of

26  Plaintiff's adjusted gross monthly income as reported on his 2005 Federal income tax return.

27     40.    Plaintiff supplied his 2005 Federal income tax return to Cabrillo Mortgage and

28  Realty Services.

**FIRST AMENDED CLASS ACTION COMPLAINT**

41.     The First Note included an "Adjustable Rate Rider" whereby the initial rate of interest was set at 1.5% from the Closing Date until March 1, 2006 (the "First Change Date"). Thereafter the rate of interest would be subject to change on the First Change Date and then on the first of every month thereafter.

42.     Upon each successive Change Date, the adjustment in the rate of interest was to be calculated by adding 3.75% to the twelve-month average of the annual yields on actively traded U.S. Treasury Securities adjusted to a constant maturity of one year.  Over the term of the loan, the rate of interest was limited to a maximum ceiling of 9.95% and a minimum floor of 3.575%.

43.     The First Mortgage contained a prepayment penalty addendum which provided that if Plaintiff made a prepayment exceeding twenty percent (20%) of the original principal amount of the note within the first thirty-six (36) months after executing the note, a prepayment penalty would be due in an amount equal to six (6) months' advance interest at the rate in effect at the time of the prepayment.

44.     Initially, Plaintiff Vargas's monthly payment was set at $1,062.97 per month for twelve (12) months.  Subsequently, according to the schedule contained in the Final Truth In Lending Disclosure Statement, the payment was expected to rise to $1,142.69 for twelve (12) months thereafter, to rise to $1,320.52 for twelve (12) months thereafter, to rise to $1,419.56 for twelve (12) months thereafter, to rise to $1,526.03 for three (3) months, and then the payment was to remain at $2,566.04 from June 1, 2011 to February 1, 2036.  This payment schedule resulted in negative amortization of the loan for the first sixty-three (63) months of the loan.

45.     The Annual Percentage Rate (hereinafter "APR") was estimated at 7.410% with the total amount of finance charges estimated at $539,890.31 over the life of the First Mortgage.

46.     The HELOC Agreement was an adjustable rate line of credit, with a principal amount of $38,500.00, and bearing interest at a 10.75% annual percentage rate.  Interest was calculated monthly on the outstanding principal balance by adding 3.5% to the highest Prime Rate as published in the "Money Rates" table of The Wall Street Journal on the first business day of each calendar month.  Over the term of the loan, the rate of interest was limited to a maximum ceiling of eighteen (18) percent.

**FIRST AMENDED CLASS ACTION COMPLAINT**

47.    Upon information and belief, no Final HUD-1 form was ever completed and provided to Plaintiff Vargas as required by federal law.  Furthermore, Plaintiff Vargas primarily speaks Spanish and, upon information and belief, none of the closing documents were translated into Spanish as required by, inter alia, California Civil Code § 1632.

48.    Plaintiff's 2005 income tax return reflects total adjusted gross annual income of $48,442.00.

49.    Due to the onerous and oppressive terms contained in the First and Second Note and Deed of Trust described above, Plaintiff Vargas was unable to continue making payments.

### As to Plaintiff Villalva

50.    On or about September 7, 2006, Plaintiff Villalva refinanced the Residence referred to herein in Los Angeles County, California, by executing a Note and Deed of Trust in favor of Home Capital Funding as Lender, with MERS, Inc. listed as the Beneficiary on the Deed of Trust in the principal amount of $416,000.00.  The Note and Deed of Trust are hereinafter referred to as the "First Mortgage."  A copy of the Note and Deed of Trust comprising the First Mortgage are attached to this Complaint as Exhibit 3.

51.    On or about September 7, 2006, as part of his refinancing the Residence, Plaintiff Villalva entered into a second Deed of Trust Home Capital Funding as Lender, with MERS, Inc. listed as the Beneficiary, in the principal amount of $51,000.00.  The Note and the Deed of Trust secured by the Note are referred to as the "Second Mortgage."  A copy of the note and deed of trust are attached as Exhibit 4.

52.    Prior to executing the First and Second Note and Deed of Trust, Plaintiff applied for a loan through a representative of Home Capital Funding.

53.    Plaintiff did not sign the application at the time it was filled out by the Home Capital Funding representative, and he was not provided a copy to review prior to the application being submitted to Home Capital Funding.

54.    Defendant Home Capital Funding, through its agent mortgage broker, before the Plaintiff executed the documents related to the First and Second Mortgages, represented to Plaintiff that the payment on the first and second mortgages, not including taxes and insurance

**FIRST AMENDED CLASS ACTION COMPLAINT**

1    was to be approximately $2,000.00 per month, encouraged Plaintiff to take the mortgages, make

2    the minimum payments due under the mortgages, and refinance the mortgages later.    The

3    increases in interest rate under the Adjustable Rate Note were not explained or properly disclosed

4    to Plaintiff as described below.

5         55.     The initial monthly payments required under the First and Second Mortgages were

6    48 percent of Plaintiff's adjusted gross monthly income as reported on his 2005 Federal income

7    tax return.

8         56.     Plaintiff supplied his 2005 Federal income tax return and pay stubs to Home

9    Capital Funding.

10        57.     The First Note included an "Adjustable Rate Rider" whereby the initial rate of

11   interest was set at 1.0% from the Closing Date until November 1, 2006 (the "First Change Date").

12   Thereafter the rate of interest would be subject to change on the First Change Date and then on

13   the first of every month thereafter.

14        58.     Upon each successive Change Date, the adjustment in the rate of interest was to be

15   calculated by adding 3.625% to the twelve-month average of the annual yields on actively traded

16   U.S. Treasury Securities adjusted to a constant maturity of one year.   Over the term of the loan,

17   the rate of interest was limited to a maximum ceiling of 9.95% and a minimum floor of 3.625%.

18        59.     The First Mortgage contained a prepayment penalty addendum which provided

19   that if Plaintiff made a prepayment exceeding twenty percent (20%) of the original principal

20   amount of the note within the first thirty-six (36) months after executing the note, a prepayment

21   penalty would be due in an amount equal to six (6) months' advance interest at the rate in effect at

22   the time of the prepayment.

23        60.     Initially, Plaintiff Villalva's monthly payment was set at $1,338.02 per month for

24   twelve (12) months.   Upon information and belief, the payment schedule resulted in negative

25   amortization of the loan.

26        61.     The Second Mortgage note in the amount of $51,000.00 and bearing interest at a

27   11.0% annual percentage rate, required monthly payments of $458.68.

28        62.     Upon information and belief, no Final HUD-1 form was ever completed and

**FIRST AMENDED CLASS ACTION COMPLAINT**

provided to Plaintiff Villalva as required by federal law.  Furthermore, Plaintiff Villalva primarily speaks Spanish and, upon information and belief, none of the closing documents were translated into Spanish as required by, inter alia, California Civil Code § 1632.

63.     Plaintiff's 2005 income tax return reflects total adjusted gross annual income of $44,537.00.

64.     Due to the onerous and oppressive terms contained in the First and Second Note and Deed of Trust described above, Plaintiff Villalva was unable to continue making payments.

65.     The servicing of the Villalva loans was transferred to Defendant Countrywide Homes Loans, Inc. and later transferred to Defendant Bank of America.

### As to Plaintiff Martinez

66.     On or about July 19, 2007, Plaintiff Martinez refinanced the Residence referred to herein in San Bernardino County, California, by executing a Note and Deed of Trust in favor of MortgageIt as Lender, with MERS, Inc. listed as the Beneficiary on the Deed of Trust in the principal amount of $409,000.00.  The Note and Deed of Trust are hereinafter referred to as the "First Mortgage."  A copy of the Note and Deed of Trust comprising the First Mortgage are attached to this Complaint as Exhibit 5.

67.     Defendant GMAC Mortgage is the current servicer of Plaintiff Martinez's loan.

68.     MortgageIt, Inc. is a subsidiary of Deutsche Bank.

69.     Prior to executing the Note and Deed of Trust, Plaintiff applied for a loan through representatives of MortgageIt, who were, upon information and belief, was acting as an agent of Defendant MortgageIt, Inc. and/or Deutsche Bank.

70.     Upon information and belief, Plaintiff did not sign the application at the time it was filled out by the MortgageIt representative, and he was not provided a copy to review prior to the application being submitted to MortgageIt, Inc.

71.     The monthly payments under the Note and Deed Trust referred to herein were 62 percent of Plaintiff's adjusted gross monthly income as reported on his 2006 Federal income tax return.

72.     Upon information and belief, no Final HUD-1 form was ever completed and

**FIRST AMENDED CLASS ACTION COMPLAINT**

provided to Plaintiff Martinez as required by federal law. Furthermore, Plaintiff Martinez primarily speaks Spanish and, upon information and belief, none of the closing documents were translated into Spanish as required by, inter alia, California Civil Code § 1632.

73.     Plaintiff's 2006 income tax return reflects total adjusted gross annual income of $54,943.00.

## FIRST CLAIM FOR RELIEF

**(Violation of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.***
**and Regulation Z, 12 CFR § 226, *et seq*.)**
**(As to Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home**
**Capital Funding, MortgageIt, Inc.)**

74.     Plaintiffs incorporate by this reference and reallege the allegations contained in paragraphs 1 through 73 above as if set forth fully herein.

75.     As defined in 15 U.S.C.A. § 1602, the transaction between Plaintiff Vargas and Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender was a "credit sale," Plaintiff was a "consumer," and Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender was a "creditor."

76.     As defined in 15 U.S.C.A. § 1602, the transaction between Plaintiff Villalva and Defendant Home Capital Funding was a "credit sale," Plaintiff was a "consumer," and Defendant Home Capital Funding was a "creditor."

77.     As defined in 15 U.S.C.A. § 1602, the transaction between Plaintiff Martinez and Defendant MortgageIt, Inc. was a "credit sale," Plaintiff was a "consumer," and Defendant MortgageIt, Inc. was a "creditor."

78.     Pursuant to 15 U.S.C.A. § 1638(b)(1), Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc. were required to make certain specified disclosures "before credit [was] extended."

79.     Upon information and belief, Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender violated 15 U.S.C.A. § 1638 as to Plaintiff Vargas and others similarly situated by improperly and/or inadequately disclosing one or more of the following items:

13

**FIRST AMENDED CLASS ACTION COMPLAINT**

a.   The annual percentage rate;

b.   The finance charge;

c.   The amount financed;

d.   The total number of payments;

e.   The payment schedule;

f.   Whether the loan has a demand feature;

g.   Whether the loan has a variable rate feature, and if so, to make disclosure about the variable rate feature;

h.   Whether the borrower may be entitled to a refund of a portion of the finance charges; and

i.   Whether the loan is subject to a prepayment penalty, and if so, to make disclosure about the prepayment penalty terms.

80.   Upon information and belief, Defendant Home Capital Funding violated 15 U.S.C.A. § 1638 as to Plaintiff Villalva and others similarly situated by improperly and/or inadequately disclosing one or more of the following items:

a.   The annual percentage rate;

b.   The finance charge;

c.   The amount financed;

d.   The total number of payments;

e.   The payment schedule;

f.   Whether the loan has a demand feature;

g.   Whether the loan has a variable rate feature, and if so, to make disclosure about the variable rate feature;

h.   Whether the borrower may be entitled to a refund of a portion of the finance charges; and

i.   Whether the loan is subject to a prepayment penalty, and if so, to make disclosure about the prepayment penalty terms.

81.   Upon information and belief, Defendant MortgageIt, Inc. violated 15 U.S.C.A. §

14

1638 as to Plaintiff Martinez and others similarly situated by improperly and/or inadequately disclosing one or more of the following items:

   a. The annual percentage rate;

   b. The finance charge;

   c. The amount financed;

   d. The total number of payments;

   e. The payment schedule;

   f. Whether the loan has a demand feature;

   g. Whether the loan has a variable rate feature, and if so, to make disclosure about the variable rate feature;

   h. Whether the borrower may be entitled to a refund of a portion of the finance charges; and

   i. Whether the loan is subject to a prepayment penalty, and if so, to make disclosure about the prepayment penalty terms.

82. Upon information and belief, charges were imposed on Plaintiffs and others similarly situated without being properly disclosed pursuant to 15 U.S.C. § 1605 and Regulation Z Section 226.4.

83. Upon information and belief, Defendants and/or its agent calculated the annual percentage rate based on improperly calculated and disclosed amounts, violating 15 U.S.C. § 1601, *et seq.* and Regulation Z Sections 226.18(c), 18(d), and 22.

84. As a result of Defendants' violations as set forth herein, Plaintiffs are entitled to damages as set forth below.

85. Upon information and belief, Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc. through its agents, fraudulently misrepresented and concealed the true facts related to the items subject to disclosure from Plaintiffs, and Plaintiffs did not discover the Defendants' failure to make the disclosures pursuant to 15 U.S.C. § 1638 until one year within the filing of this complaint.

**FIRST AMENDED CLASS ACTION COMPLAINT**

## SECOND CLAIM FOR RELIEF

**(Violation of Home Ownership and Equity Protection Act, 15 U.S.C. §§ 1602(aa), 1610, and 1639)**
**(As to Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc.)**

86.     Plaintiffs incorporate by this reference and reallege the allegations contained in paragraphs 1 through 85 above as if set forth fully herein.

87.     As defined in 15 U.S.C. § 1602(aa), each of the transactions between Plaintiff Vargas and Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender which resulted in the execution of the First and Second Mortgages was a "mortgage," being a consumer credit transaction other than a mortgage for the original purchase or construction of a dwelling, secured by Plaintiff's principal dwelling, Plaintiff was a "consumer," and Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender (Lender) was a "creditor."

88.     As defined in 15 U.S.C. § 1602(aa), each of the transactions between Plaintiff Villalva and Defendant Home Capital Funding which resulted in the execution of the First and Second Mortgages was a "mortgage," being a consumer credit transaction other than a mortgage for the original purchase or construction of a dwelling, secured by Plaintiff's principal dwelling, Plaintiff was a "consumer," and Defendant Home Capital Funding (Lender) was a "creditor."

89.     As defined in 15 U.S.C. § 1602(aa), the transaction between Plaintiff Martinez and Defendant MortgageIt, Inc. which resulted in the execution of the Note and Deed of Trust was a "mortgage," being a consumer credit transaction other than a mortgage for the original purchase or construction of a dwelling, secured by Plaintiff's principal dwelling, Plaintiff was a "consumer," and Defendant MortgageIt, Inc. (Lender) was a "creditor."

90.     Pursuant to 15 U.S.C. § 1639, Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc. were required to make certain specified disclosures as listed below "not less than three (3) business days prior to the consummation of the transaction."

91.     Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc., upon information and belief, violated 15 U.S.C. §

16

**FIRST AMENDED CLASS ACTION COMPLAINT**

1639 by improperly and/or inadequately disclosing one or more of the following items:

    a.    The specific disclosure, in a "conspicuous type size," that "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application;"

    b.    The specific disclosures, in a "conspicuous type size," that "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan;"

    c.    The annual percentage rate;

    d.    The amount of the regular monthly payment if the interest rate was a fixed rate; or

    e.    The annual percentage rate of the loan, the amount of the regular monthly payment, a statement that the interest rate and monthly payment pay increase, and the amount of the maximum monthly payment if the transaction was other than a fixed interest rate transaction; and

    f.    The amount financed.

92.    The Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender and Home Capital Funding violated 15 U.S.C. § 1639 by making loans to Plaintiffs Vargas and Villalva, and, upon information and belief, to others similarly situated, that included one or more of the following terms:

    a.    A prepayment penalty that was not within the exception contained in 15 U.S.C. § 1639 (c)(2)(A)-(D);

    b.    A "balloon payment" as defined in 15 U.S.C. 1639(e), which was due on a loan that had a term of less than 5 years;

    c.    Negative amortization as defined in 15 U.S.C. § 1639(f).

93.    The Defendants violated 15 U.S.C. § 1639(h) by engaging in a pattern or practice of extending credit to Plaintiffs and other similarly situated individuals under a mortgage without regard to their repayment ability, including their current and expected income, current obligations, and employment.

94.    In Plaintiff Vargas' case, the Plaintiff's adjusted gross income as shown on

17

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   Plaintiff's 2005 income tax return was $48,442.00 or $4,036.83 per month. The initial monthly

2   payment on the mortgage was $1,062.97 for 12 months; however, the payment which would have

3   not resulted in negative amortization was $2,566.04, which was 64 percent of Plaintiff's monthly

4   income.

5        95.   In Plaintiff Villalva's case, the Plaintiff's adjusted gross income as shown on

6   Plaintiff's 2005 income tax return was $44,537.00 or $3,711.42 per month. The initial monthly

7   payment on the first mortgage was $1,338.02; the monthly payment on the second mortgage was

8   $485.68, and the combined monthly payment was 48 percent of Plaintiff's monthly income.

9        96.   In Plaintiff Martinez's case, the Plaintiff's adjusted gross income as shown on

10  Plaintiff's 2006 income tax return was $54,943.00 or $4,758.58 per month. The initial monthly

11  payment on the first mortgage was $3,019.98, which was 63 percent of Plaintiff's monthly

12  income.

13       97.   As to the named Plaintiffs Vargas, Villalva, and Martinez, respectively,

14  Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital

15  Funding, and MortgageIt, Inc., respectively, made a loan regulated by 15 U.S.C. §§ 1602(aa) and

16  1639 without making the disclosures as set forth in paragraphs 91a and 91b.

17       98.   Additionally, the Vargas and Villalva First Mortgages included provisions for

18  prepayment penalties and the payments under the First Mortgages resulted in negative

19  amortization, which are prohibited as set forth in paragraph 91 above.

20       99.   Upon information and belief, the principal amount of the loans exceeded the

21  appraised value of the Plaintiffs' Residences.

22       100.   As a result of Defendant's violations as set forth herein, Plaintiffs are entitled to

23  damages as set forth below, including, but not limited to statutory damages pursuant to 15 U.S.C.

24  § 1640.

25       101.   Upon information and belief, Defendants, through their agents, fraudulently

26  misrepresented and concealed the true facts related to the items subject to disclosure from

27  Plaintiffs, and Plaintiffs did not discover the Defendant's failure to make the disclosures pursuant

28  to 15 U.S.C. § 1639 until within one year before the filing of this complaint.

**FIRST AMENDED CLASS ACTION COMPLAINT**

### THIRD CLAIM FOR RELIEF

**(Violation of Fair Housing Act, 42 U.S.C. § 3601, *et seq.*)**
**(As to Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc.)**

102. Plaintiff incorporates by this reference and realleges the allegations contained in paragraphs 1 through 101 above as if set forth fully herein.

103. The making of a loan, such as the loan to Plaintiffs referred to herein, is a "real estate related transaction" subject to the Federal Fair Housing Act.

104. Defendants, Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc., at all material times hereto, were lenders subject to the federal Fair Housing Act, and were prohibited from discriminating against, or providing disparate treatment to, individuals on the basis of race, color, religion, sex, familial status, and national origin.

105. Plaintiffs are members of the class of individuals subject to protection from discrimination and/or disparate treatment under the Federal Fair Housing Act.

106. Upon information and belief, Defendants purposefully targeted Plaintiffs, and others similarly situated, as borrowers based on Plaintiffs' race and/or national origin, knowing that Plaintiffs suffered from language barriers inherent to Plaintiffs' Hispanic origin, making Plaintiffs vulnerable to predatory lending practices, including, but not limited to, violations of the Truth in Lending Act, the Home Ownership and Equity Protection Act and, *inter alia,* California Civil Code § 1632, as alleged herein.

107. Upon information and belief, Defendants offered Plaintiffs, and others like Plaintiffs, a less-than-favorable loan than would have been offered to a white borrower, all other things being equal, in violation of the Federal Fair Housing Act based on the disparity between the loan terms which were available to Hispanic borrowers and the loan terms available to white borrowers.

108. Defendants' violation of the Federal Fair Housing Act as alleged herein has caused Plaintiffs to suffer damages, including, but not limited to, financial losses, damage to reputation,

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   embarrassment, humiliation, and emotional distress, and Plaintiffs have incurred attorneys' fees

2   and costs in this matter.

3       109.   Defendants' violation of the Federal Fair Housing Act alleged herein was reckless,

4   willful, and wanton, entitling Plaintiffs to an award of punitive damages against Defendants.

5       110.   Upon information and belief, Defendants' violation of the Federal Fair Housing

6   Act as alleged herein is and/or has been a continuing violation whereby Defendants have engaged

7   in a pattern or extended practice of exploiting the market of Hispanics in the market area where

8   Plaintiffs reside.

**FOURTH CLAIM FOR RELIEF**
**(Violation of California Civil Code § 1632)**
**(As to Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc.)**

    111.   Plaintiffs incorporate by this reference and reallege the allegations contained in paragraphs 1 through 110 above as if set forth fully herein.

    112.   Defendant Countrywide Home Loans dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc., respectively, violated California Civil Code § 1632 ("California Translation Act"), by not providing Plaintiffs Vargas, Villalva, and Martinez, respectively, and others similarly situated, a written translation of the First or Second Mortgage documents and/or the required disclosures, from English to Spanish, or such other primary language as would have been readily understandable by the Plaintiffs and class members prior to the execution of the loan documents.

    113.   Upon information and belief, Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc. individually and through their agents, were aware that English was not Plaintiffs' primary language, and that they and each class member had difficulties in reading and understanding English or could not read or understand English at all.

    114.   The initial discussions and negotiations between Plaintiff Vargas and the representative of Cabrillo Mortgage and Realty Services, acting as agent for Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender, between Plaintiff Villalva and

20

the representative acting as agent for Home Capital Funding, and between Plaintiff Martinez and the representative acting as agent for Mortgagelt, Inc. were conducted primarily in Spanish. Upon information and belief, each class member conducted his or her negotiations in his or her native language, *e.g.,* Spanish, Chinese, Tagalog, Vietnamese, or Korean.

115.    Upon information and belief, Plaintiffs (and each class member) did not bring an interpreter to the location designated by Defendants and/or their agents as the location for signing the loan documents to translate the loan documents, including, but not limited to, the First and Second Mortgages that Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender and Home Capital Funding, respectively, caused to be sold to Plaintiffs Vargas and Villalva, respectively, and the mortgage that Defendant Mortgagelt, Inc. sold to Plaintiff Martinez.

116.    The loan documents provided to Plaintiffs by Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender and/or its agent, Cabrillo Mortgage and Realty Services, Home Capital Funding, and Mortgagelt, Inc. were written in English.  Defendants did not provide an interpreter or a translation of these documents.  Upon information and belief, there was no sign posted at the loan offices, or otherwise, informing Plaintiffs or class members that a translation would be available upon request, in violation of California Civil Code § 1632(f).

117.    Upon information and belief, Defendants Countrywide Home Loans, Inc., Home Capital Funding, and Mortgagelt, Inc. targeted customers with limited English skills, knowing that they would be less able to question the proposed terms of the loans, or adequately understand the risks and misrepresentations made by Defendants and their subsidiaries and/or their agents than a person who had knowledge of the English language.

118.    Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and Mortgagelt, Inc., respectively, acting by and through their agents, are, within the meaning of California Civil Code § 1632(b), a person engaged in a business who negotiated the First and Second Mortgages primarily in Spanish with the Plaintiffs Vargas, Villalva, and Martinez, respectively.

119.    The First and Second Mortgages referred to herein are loans within the meaning of

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   subsection (b)(4) of California Civil Code § 1632, in that the loan proceeds were for use

2   primarily for personal, family, or household purposes.   The transactions are subject to the

3   provisions of Article 7, commencing with § 10240, of Chapter 3 of Part 1 of Division 4 of the

4   California Business and Professions Code, of Division 7, commencing with § 18000, or Division

5   9, commencing with § 22000, of the California Financial Code.

6   120.   Plaintiffs, and, upon information and belief, each class member, did not negotiate

7   the final terms of the loans (including the First and Second Mortgages) through any interpreter

8   within the meaning of subsection (h) of California Civil Code § 1632.

9   121.   Upon information and belief, Defendants controlled and/or directed the acts of

10   their agents, assignees and other defendants and/or third parties in having the loan finalized

11   without first complying with California Civil Code § 1632.

12   122.   Defendants' violation of California Civil Code § 1632(k) entitle Plaintiffs to

13   rescind the contracts with Defendants and/or their agents and/or assignees.

14   123.   Pursuant to California Civil Code § 1691(a), Plaintiffs, promptly upon discovering

15   the facts which entitle them to rescind and once plaintiffs were aware of their right to rescind,

16   gave notice, or hereby give notice, of rescission to Defendants in compliance with California

17   Civil Code §§ 1632 and 1691.

18   124.   As a direct and proximate result of Defendants' violation of California Civil Code

19   § 1632, Plaintiffs have suffered damages.   Defendant Countrywide Home Loans, Inc. dba

20   America's Wholesale Lender is liable to Plaintiff Vargas for rescission; termination of any

21   security interest in the Vargas Residence created under the First and/or Second Mortgages; and

22   restitution, including all interest, appraisals, loan origination fees, costs, and other amounts, plus

23   interest paid since the origination of the First and Second Mortgages in an amount to be proven at

24   trial. Defendant Home Capital Funding is liable to Plaintiff Villalva for rescission; termination of

25   any security interest in the Villalva Residence created under the First and/or Second Mortgages;

26   and restitution, including all interest, appraisals, loan origination fees, costs, and other amounts,

27   plus interest paid since the origination of the First and Second Mortgages in an amount to be

28   proven at trial.   Defendant MortgageIt, Inc. is liable to Plaintiff Martinez for rescission;

22

1  termination of any security interest in the Martinez Residence created under the First Mortgage;

2  and restitution, including all interest, appraisals, loan origination fees, costs, and other amounts,

3  plus interest paid since the origination of the First Mortgage in an amount to be proven at trial.

4
## FIFTH CLAIM FOR RELIEF
5  **(Violation of California Business and Professions Code § 17200)**
   **(As to Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender,**
6  **Home Capital Funding and MortgageIt, Inc.)**

7
8  125.    Plaintiffs incorporate by this reference and reallege the allegations contained in

9  paragraphs 1 through 124 above as if set forth fully herein.

10  126.    Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender,

11  Home Capital Funding, and MortgageIt, Inc. engaged in a systematic practice of negotiating

12  loans knowing that the proposed borrower could not understand the details of English-only loan

13  documents presented to Plaintiffs when English was not the borrowers' native language.

14  127.    The marketing, arranging, origination, processing, documentation, wire-

15  transmittal, and coordination of courier services incidental to providing a loan, by Defendants, on

16  their own account and/or as a part of the overall deceptive practices of their agents and affiliates,

17  constitutes the providing of "Services" within the meaning of the California Business and

18  Professions Code § 17200 (also referred to as the Unfair Competition Law or "UCL").

19  128.    The unlawful, unfair, or fraudulent providing of "Services" as alleged herein and

20  the failure to translate the loan documentation into Spanish as required by California Civil Code §

21  1632 are incidental to the actual provision of any loan by Defendants, and separately constitute

22  practices prohibited by the UCL.   Conformance with California Civil Code § 1632 does not

23  obstruct, impair, or improperly condition a Defendant's ability make real estate loans under 12

24  U.S.C. § 371 and 12 C. F. R. § 34.3, or otherwise.

25  129.    This failure to translate the documents, along with the general misrepresentations

26  as alleged herein, constitutes a practice that was likely to, and did, deceive members of the public,

27  including Plaintiffs.

28  130.    Through Defendants' unlawful, unfair, and/or fraudulent business practices, as

**FIRST AMENDED CLASS ACTION COMPLAINT**

1    alleged above, Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender,

2    Home Capital Funding, and MortgageIt, Inc. targeted people Defendants knew or should have

3    known were vulnerable to Defendants' unscrupulous loan practices.

4    131.    Upon information and belief Defendants, and each of them, and/or their agents and

5    assignees, used deception, false promises, and misrepresentation regarding the terms of the loans

6    and Services offered to Plaintiffs, and to others similarly situated, in misrepresenting, concealing,

7    or omitting the terms of the loans, Services and costs, including but not limited to the interest

8    rate, the payments to be made under the loans, the existence of a balloon payment and/or negative

9    amortization, Plaintiffs' ability to qualify for the loans, and Plaintiffs' ability to refinance the

10    loans, if necessary, in the future.

11    132.    Plaintiffs, and similarly situated class members, reasonably relied upon

12    Defendants' representations that the loan and terms were favorable to Plaintiffs and that the loans

13    would be affordable for them. Upon information and belief, each class member likewise believed

14    that Defendants, and each of them, provided or would provide full and honest information and

15    guidance regarding the terms of the loan, including and in addition to the Services alleged above,

16    and that the provision of such information was independent and incidental to the actual furnishing

17    of the loan.

18    133.    Plaintiffs did rely on Defendants' representations concerning the terms of the

19    loans and Plaintiffs' ability to repay the loans in entering into the loans as alleged herein.

20    134.    In reality, Defendants made the subject loans to Plaintiffs without making any

21    determination that the loans were based on any commercially reasonable means or mechanism for

22    determining Plaintiffs' ability to repay the loans. Based on the financial information Plaintiffs

23    provided to Defendants, including Plaintiffs' income, Defendants knew prior to closing the loan

24    that Plaintiffs would not be capable of making loan payments as required by the terms of the loan.

25    135.    Defendants omitted and concealed the magnitude of risk of loss of the home from

26    Plaintiffs by, *inter alia,* failing to translate the relevant documents into Spanish or such other

27    language that could be readily understood by Plaintiffs, or any similarly situated class member.

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

136.     As a proximate result of Defendants' violation of California Business and Professions Code § 17200, Plaintiffs (and other similarly situated class members) were injured in fact and suffered damages to reputation, emotional distress, humiliation, loss of financial resources, and money damages, including inflated interest, costs of Services, increased interest rates on other loans or lines of credit, late payment penalties, and other economic damages to be proven at trial.  In addition, Plaintiffs have incurred attorneys' fees and costs in connection with bringing this claim.

137.     As a result of Defendants' violation of the Translation Act and the UCL, Plaintiffs are entitled to, *inter alia,* restitution.

## SIXTH CLAIM FOR RELIEF
### (Conspiracy to Commit Fraud and Conversion)
**(As to Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, MortgageIt, Deutsche Bank and MERS, Inc.)**

138.     Plaintiffs incorporate by this reference and reallege the allegations contained in paragraphs 1 through 137 above as if set forth fully herein.

139.     Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender and MERS, Inc. formed an association to conspire to deprive Plaintiff Vargas of his interest in his property through fraud and misrepresentation that would result in Plaintiff Vargas entering a loan for which Plaintiff would eventually not be qualified.

140.     Defendants Home Capital Funding and MERS, Inc. formed an association to conspire to deprive Plaintiff Villalva of his interest in his property through fraud and misrepresentation that would result in Plaintiff Villalva entering a loan for which Plaintiff would eventually not be qualified.

141.     Defendants MortgageIt, Inc., Deutsch Bank, and MERS, Inc. formed an association to conspire to deprive Plaintiff Martinez of his interest in his property through fraud and misrepresentation that would result in Plaintiff Martinez entering a loan for which Plaintiff would eventually not be qualified.

142.     Upon information and belief, Defendants intended that the loans made to the Plaintiffs would be packaged with other loans and sold on the secondary market, resulting in a

1   profit to Defendants.

2       143.    Defendants, and each of them, knew prior to the origination of the loans and

3   subsequent transfer of the loans that Plaintiffs were not qualified to make the loan; however,

4   Defendants knew or should have known that Plaintiffs would rely and did rely on Defendants'

5   Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and

6   MortgageIt, Inc.'s representations as alleged herein related to Plaintiffs' ability to repay the loans

7   or to refinance the loans in taking the loans and signing the documents.   As previously alleged

8   herein, such representations violated the California Business and Professions Code as alleged

9   herein.

10      144.    As previously alleged herein, Defendants Countrywide Home Loans, Inc. dba

11  America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc. violated the Truth in

12  Lending Act, the Federal Fair Housing Act, the Home Ownership and Equity Protection Act, the

13  California Translation Act and California Business & Professions Code as alleged herein in

14  procuring Plaintiffs' signatures on the First and Second Mortgages.

15      145.    Defendants' legal objective of packaging the loans made to Plaintiffs with other

16  loans and selling the loans was accomplished by illegal means in procuring the loans because of

17  Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital

18  Funding, and MortgageIt, Inc.'s violation of the Truth in Lending Act, the Federal Fair Housing

19  Act, the Home Ownership and Equity Protection Act, and the California Translation Act, and

20  California Business and Professions Code as alleged herein.

21      146.    Upon information and belief, as an alternative to packaging and selling Plaintiffs'

22  loans, Defendants Countrywide Home Loans, Inc., Home Capital Funding, and MortgageIt, Inc.

23  knew that the loans would be subject to foreclosure as a result of Plaintiffs' inability to make

24  payments on the loans as the payments escalated during the term of the loans and/or as a result of

25  Plaintiffs' inability to qualify to refinance the loans at a later date after the payments began to

26  escalate because of changes in the interest rates.

27      147.    Upon information and belief, the escalating payments and/or increases in the

28  interest rate were not properly disclosed to Plaintiffs as alleged herein.

**FIRST AMENDED CLASS ACTION COMPLAINT**

148.   Defendants intended that Plaintiffs would default on the loans and Defendants would be in a position of seizing the Residences in a foreclosure action, unlawfully depriving Plaintiffs of the Residences.

149.   Defendants, and each of them, in furtherance of the conspiracy and agreement alleged herein, acted in a concerted manner to target Plaintiffs as borrowers, to misrepresent the loan terms and/or to misrepresent Plaintiffs' qualification for the loans, knowing that such action or actions would result in Defendants' ultimate possession of the Residence following foreclosure.

150.   As a result of Defendants' conspiracy described herein, Plaintiffs have suffered injuries which include mental anguish, emotional distress, embarrassment, humiliation, loss of reputation and a decreased credit rating which has, or will, impair Plaintiffs' ability to obtain credit at a more favorable rate than before the decrease in credit rating, the loss or anticipated loss of the Residence and other financial losses according to proof, including incurred attorneys' fees and costs incurred in this matter.

151.   Defendants' conspiracy to unlawfully deceive Plaintiffs into the loans alleged herein was willful and wanton, justifying an award of punitive damages.

**SEVENTH CLAIM FOR RELIEF**
**(Conspiracy To Commit Fraud Related To MERS System)**
**(As to Defendants MERSCORP, INC., Mortgage Electronic Registration Systems, Inc. ("MERS, Inc."), Freddie Mac, Fannie Mae, GMAC Mortgage, L.L.C., National City Mortgage, National City Bank, National City Corporation, PNC Financial Services Group, Inc., J.P. Morgan Chase Bank, N.A., CitiMortgage, Inc., Countrywide Home Loans, Inc., HSBC Mortgage Corporation, U.S.A., Wells Fargo Bank, N.A., GE Money Bank, Bank of America, N.A., AIG United Guaranty Corporation, Home Capital Funding, and MortgageIt, Inc.)**

152.   Plaintiffs incorporate by this reference and reallege the allegations contained in paragraphs 1 through 151 above as if set forth fully herein.

153.   Upon information and belief, Defendants MERSCORP, Inc., MERS, Inc., Freddie Mac, Fannie Mae, GMAC Mortgage, L.L.C., National City Mortgage, National City Bank, National City Corporation, PNC Financial Services Group, Inc., J.P. Morgan Chase Bank, N.A., CitiMortgage, Inc., Countrywide Home Loans, Inc., HSBC Mortgage Corporation, Wells Fargo

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   Bank, N.A., America's Servicing Company, GE Money Bank, Bank of America, N.A., AIG

2   United Guaranty Corporation, Home Capital Funding, and MortgageIt, Inc. (hereinafter in this

3   Seventh Claim for Relief collectively referred to for purposes of this Seventh Claim as the

4   "Defendant conspirators"), and each of them, did knowingly and willfully conspire and agree

5   among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage

6   in fraudulent and predatory lending practices perpetrated on Plaintiffs as alleged in the Seventh

7   Claim for Relief herein by the actions of the Defendant conspirators as part of the business

8   policies and practices of each Defendant conspirators in participating in the MERS system.

9           154.   Upon information and belief, the Defendant conspirators are or have been

10  shareholders in MERSCORP, Inc., MERS, Inc. and/or members of the MERS system, and, as to

11  Defendant conspirators, Freddie Mac, Fannie Mae, GMAC Mortgage, L.L.C., National City

12  Mortgage, and J.P. Morgan Chase Bank, N.A., have, through their employees and agents, served

13  as members of the Board of Directors of MERSCORP, Inc. and/or MERS, Inc., and participated

14  in the design and coordination of the MERS system described in this complaint

15          155.   Defendants' participation as shareholders, directors, operators, or members of

16  MERSCORP, Inc. and/or MERS, Inc. are as follows:

17          a.      Defendants J.P. Morgan Chase Bank, CitiMortgage, Inc., Countrywide Home

18  Loans, Inc., Fannie Mae, Freddie Mac, Merrill Lynch, AIG United Guaranty Corporation, and

19  Wells Fargo Bank, N.A. are each Shareholders of MERSCORP, Inc.

20          b.      MERSCORP, Inc. is the operating company that owns and operates the MERS

21  System described herein, and is the parent company of Mortgage Electronic Registration

22  Systems, Inc. ("MERS, Inc.").

23          c.      Defendants Freddie Mac, MERSCORP, Inc., National City Mortgage, Fannie Mae,

24  and AIG United Guaranty Corporation are directors of MERS, Inc. and/or MERSCORP, Inc.

25          d.      Defendants Freddie Mac, Fannie Mae, GMAC Mortgage, L.L.C., National City

26  Mortgage, National City Bank, National City Corporation, J.P. Morgan Chase Bank, N.A.,

27  CitiMortgage, Inc., Countrywide Home Loans, Inc., HSBC Mortgage Corporation, U.S.A., GE

28  Money Bank, Bank of America, N.A., Wells Fargo Bank, N.A., America's Servicing Company,

Amended complaint

**FIRST AMENDED CLASS ACTION COMPLAINT**

1    AIG United Guaranty Corporation, Home Capital Funding, and MortgageIt, Inc. are Members of

2    MERS, Inc.

3         156.    Whenever this Complaint refers to any corporation's act, deed, or transaction, it

4    means that such corporation engaged in the act, deed, or transaction by or through its members,

5    officers, directors, agents, employees, or other representatives while they actively were engaged

6    in the management, direction, control, or transaction of its business or affairs.

7         157.    Beginning at a time unknown to the Plaintiffs, prior to 2004, and continuing

8    through at least the present, the Defendant co-conspirators engaged in a conspiracy to unlawfully

9    deprive borrower-homeowners of their interest in property in numerous states through issuing

10   predatory loans as described herein, and through the securitization and subsequent processes

11   described herein.

12        158.    MERS, Inc. and/or MERSCORP, Inc. arranged for bilateral and multilateral

13   meetings, bilateral and multilateral teleconferences, and bilateral internet communications with

14   potential Shareholders, actual Shareholders, candidates for Membership, and Members.

15        159.    Upon information and belief, the Defendant conspirators have conspired among

16   themselves and with other unknown parties to:

17        a.      develop a system of earning profits from the origination and securitization of

18   residential loans without regard for the rights of Plaintiffs, and others similarly situated, by

19   engaging in predatory and deceptive residential lending practices as alleged in this complaint

20   above; and

21        b.      in furtherance of the system referred to immediately above, the  Defendant

22   conspirators intentionally created, managed, operated and controlled the Defendants

23   MERSCORP, Inc. and MERS, Inc. for the specific purpose of MERS, Inc. being designated as a

24   sham "beneficiary" in the original deeds of trust securing those loans, including the loan made to

25   Plaintiffs and other similarly situated individuals by Countrywide Home Loans, Inc. and/or its

26   division or subsidiary America's Wholesale Lender Home Capital Funding and MortgageIt, Inc.;

27   and

28        c.      Defendant conspirators intentionally created, managed, operated and controlled the

Amended complaint

1   MERS system with the unlawful intent and for the unlawful purpose of making it difficult or

2   impossible for Plaintiffs and other victims of such industry-wide predatory policies and practices

3   to identify and hold responsible the persons and entities responsible for the unlawful actions by

4   Countrywide Home Loans, Inc. and/or its division or subsidiary America's Wholesale Lender,

5   Home Capital Funding, MortgageIt, Inc., and MERS, Inc. and their co-conspirators.

6       160.    Upon information and belief, Defendant conspirators, through creation of the

7   MERS system alleged herein, adopted and implemented residential lending underwriting

8   guidelines for use in Arizona and in other states which:

9       a.      were intended to, and did, generate unprecedented profits for the Defendant

10  conspirators and their co-conspirators at the expense of Plaintiffs and other persons who were

11  fraudulently induced by the Defendant conspirators and their co-conspirators into taking out

12  residential loans that were known by the Defendant conspirators and their co-conspirators, at the

13  time the loans were originated, and

14      b.      were likely to result in foreclosure on those loans and loss by Plaintiffs and other

15  borrowers of their homes, with reckless disregard and intentional indifference by the Defendant

16  conspirators and their co-conspirators of the likelihood of such foreclosure.

17      161.    Removing real estate transaction records from the public record maintained by the

18  county clerks prevents oversight of real estate transactions by the public and by public officials.

19      162.    MERSCORP, Inc. informed its co-conspirators that using the MERS system would

20  remove transaction records from the public record.

21      163.    MERSCORP, Inc. and/or MERS, Inc. have publicly stated the following:

22      a.      "MERS eliminates the need to prepare and record assignments when trading

23  residential and commercial mortgage loans."

24      b.      "With the recording of the security instrument(s), MERS becomes the mortgagee

25  in the county land records and no assignments are required during a subsequent sale and transfer

26  of the loan between MERS members."

27      c.      "There is no dependency on the corporate name you use on closing documents and

28  the corresponding corporate name on the MERS System because the MERS System is not the

30

1    legal system of record of ownership of mortgage loans."

2        164.    Upon information and belief, the MERS system was created for the unlawful

3    purpose of hiding and insulating the brokers and originators of predatory toxic loans from

4    accountability and liability by creating an entity which simultaneously informed all lenders who

5    originated loans that named MERS as the beneficiary of the following:

6        a.      MERS would never own or acquire any actual beneficial interest in any loan in

7    which it was named as beneficiary under the deed of trust, and that

8        b.      MERS could be named as beneficiary for purposes of public notice and notice to

9    the borrower and would act in that capacity if so designated by the lender who originated the

10    loan.

11        165.    Upon information and belief, the intent and purpose of the Defendant conspirators

12    and their co-conspirators in the creation, management, operation and control of MERS was,

13    without limitation, to make it impossible for the borrowers, their attorneys, the courts, the

14    government, and anyone other than the Defendant conspirators who created and controlled MERS

15    to identify the actual beneficial owner of any particular loan or the property which was the

16    collateral securing that loan until such time, if any, that foreclosure action was initiated.    As a

17    result, Plaintiffs, and other similarly situated individuals, were deprived of the right to attempt to

18    modify their toxic loans, as the true identity of the actual beneficial owner was intentionally

19    hidden from Plaintiffs and other similarly situated individuals.

20        166.    MERSCORP, Inc.'s marketing materials also promise Members with assistance

21    with foreclosures. MERSCORP, Inc. and/or MERS, Inc. have publicly stated: "MERS has

22    assembled a Foreclosure Manual to provide a state-by-state guideline for our Members to follow

23    when foreclosing a mortgage loan in the name of MERS."

24        167.    Upon information and belief, the Defendant conspirators' actions in creating the

25    MERS system, which was dependent on fraudulent and deceptive practices that included, but

26    were not limited to, making loans to consumers such as Plaintiffs in violation of the Truth in

27    Lending Act, the Real Estate Settlement Procedures Act, and the Home Ownership and Equity

28    Protection Act, created a system to unlawfully deprive Plaintiffs of their interest in their

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   Residences.

2   168.   MERSCORP, Inc. and/or MERS, Inc. offered Members increased profit.

3   MERSCORP, Inc. has publicly stated:

4       a.      "The MERS web site enables you to target directly your MERS® Ready products

5   and services to MERS members."

6       b.      "Commercial originators and issuers save **hundreds to thousands of dollars** (in

7   the case of cross-collateralized loans) in preparing and recording assignments. Where the

8   originator has not recorded a MERS as Original Mortgagee (MOM) security instrument, the

9   issuer saves the costs of assigning to the Trust by having the originator assign to MERS."

10  (Emphasis added).

11      c.      "It will reduce risk and generate more profits for lenders because the Notes

12  registered on it will be in electronic format. *It shortens the timeframe between the closing and*

13  *the securitization of the loan*, enabling the Note to move instantly, creating faster funding."

14  (Emphasis added).

15  169.   MERSCORP, Inc.'s rules and by-laws, to which MERS Members agree, require

16  the following:

17  **BY COMPLETING, SIGNING, AND SUBMITTING THIS
    APPLICATION, THE APPLICANT IS AGREEING TO BE A
18  MERS MEMBER. THE APPLICANT HEREBY AGREES TO
    PAY ALL FEES AND EXPENSES SET FORTH IN THE MERS
19  RESIDENTIAL FEE SCHEDULE, WHICH MAY CHANGE
    FROM TIME TO TIME; ABIDE BY ALL EXISTING MERS
20  RULES AND PROCEDURES, WHICH ARE INCORPORATED
    HEREIN BY REFERENCE AND MAY BE AMENDED FROM
21  TIME TO TIME; AND COMPLY WITH THE TERMS AND
    CONDITIONS SET FORTH IN THE ATTACHED ADDENDUM
22  ENTITLED TERMS AND CONDITIONS.**

23

24  (Emphasis in original).

25

26  170.   The MERSCORP, Inc. rules and by-laws, to which MERS Members agree, cannot

27  be carried out lawfully because they require the following:

28

Amended complaint

**FIRST AMENDED CLASS ACTION COMPLAINT**

1. ***MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc.***, and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request. The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents. 2. ***The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan*** that the Member registers on the MERS® System. ***MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee***, in an administrative capacity, for the beneficial owner or owners thereof from time to time. ***MERS shall have no rights whatsoever*** to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. ***MERS agrees not to assert any rights*** (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law. *** 6. MERS and the Member agree that: (i) ***the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans***, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System."

(Emphasis added).

171.    The times, dates, and locations of the various meetings and communications among and between the conspirators are solely within the knowledge of the conspirators and have not been made public by MERS or its co-conspirators.

172.    In addition to the allegations made related to the shareholder, director, and creator conspirators, the MERS system conspiracy consisted of:

a.    The Lender conspirators who agreed to procure loans by means of violation of state and Federal lending laws, as further described in the previous claims for relief.

b.    The Lender, Securitizer, and Servicer conspirators who agreed to use the MERS system unlawfully and in violation of state and Federal laws to deceive homeowners and securities purchasers by misleading them to believe that the conspirators had legal authority to

1    foreclose when in fact, the conspirators do not have legal authority to foreclose on loans which

2    were made part of the MERS system, as further described in the previous claims for relief.

3          c.    The Securitizer conspirators who were aware of these violations of law during

4    procurement and agreed to purchase the loans knowing that the law had been violated.

5          d.    The Securitizer conspirators who, upon information and belief, packaged and sold

6    loans knowing that such loans were based on deeds of trust that had been split from the notes, and

7    based on loans that had been sold as part of the securitization process before the loans were

8    finalized with the borrowers.  Thereafter, the purported interest in the obligation, the note as

9    evidence of the obligation, and the security interest for the obligation were transferred multiple

10   times without recording the change in ownership of an interest in real property in the appropriate

11   county records.  This was accomplished by the creation of the private parallel record keeping

12   service known as the MERS system, whereby MERS, Inc. is named in the deed of trust that is

13   supposed to be the security for the underlying loan obligation.  MERS is named as the nominee of

14   the lender, but not as the holder of the note or the actual lender. Rather, MERS is named as

15   beneficiary for the purpose of deceiving the borrower and the clerk's office where the deed of

16   trust is recorded.  As a result of MERS being named as the beneficiary, and through the processes

17   described herein, the note and deed of trust are "split."  The monetary effect of utilizing the

18   MERS system, in addition to the allegations set forth otherwise herein, was to hide profits and

19   fees that were not disclosed to the borrower or to the investor in the note, which, in some cases,

20   upon information and belief, were in excess of the principal value stated on the note.

21         e.    A securitization process that was based on loans that were made based on

22   residential loan underwriting guidelines that were designed to generate as many loans as possible

23   to fuel the securitization process to feed the demand for mortgage-backed securities, the faulty

24   and toxic nature of which loans was hidden by the MERS system.

25         f.    The Securitizer conspirators who violated state and Federal securities laws through

26   their descriptions of the financial derivatives created by the conspiracy.

27         g.    The Lender conspirators who agreed to supply loans to the Securitizers despite

28   knowledge that the Securitizers would sell them in violation of the law.

h        The Servicer conspirators who agreed to unlawfully foreclose on loans despite the separation of the loan from the deed of trust that made the foreclosure unlawful.

173.   All of the conspirators agreed to the participation of the other conspirators in their individual roles in the conspiracy.  The loan files of each of the loans disclose the legal violations and document that the Lenders agreed to purchase loans from third party originators and to sell them to the Securitizers.  The Securitizers agreed to purchase the loans and pool them with full knowledge of the contents of the loan files.  The Servicers agreed to foreclose with full knowledge of the loan file for each loan.

174.   All of the conspirators continued to agree to the conspiracy over the course of thousands of transactions.

175.   Defendants Fannie Mae, Freddie Mac, J.P. Morgan Chase Bank, N.A., GMAC Mortgage, L.L.C., and National City Mortgage acted as Creators of the conspiracy.  They created MERS to hide their own unlawful activity as well as the activities of their co-conspirators.

176.   Defendants GE Money Bank and its division or subsidiary, WMC Mortgage, Countrywide Home Loans, Inc. and its division or subsidiary, America's Wholesale Lender, National City Bank, HSBC Mortgage Corporation, U.S.A., GMAC Mortgage, L.L.C., National City Mortgage, CitiMortgage, G.E. Money Bank, Wells Fargo Bank, N.A., J.P Morgan Chase, Bank of America, N.A., Home Capital Funding and MortgageIt, Inc. acted as Lenders in the conspiracy.

177.   Defendants J.P. Morgan Chase, Wells Fargo Bank, N.A., Bank of America, HSBC Mortgage Corporation (USA), GMAC Mortgage, L.L.C., National City Mortgage, National City Bank, Countrywide Home Loans, Inc., CitiMortgage and GE Money Bank acted as Securitizers in the conspiracy.

178.   Defendants America's Servicing Company, Countrywide Home Loans, Inc., Bank of America, Wells Fargo Bank, N.A., GMAC Mortgage, L.L.C., CitiMortgage, Inc., National City Mortgage, J.P. Morgan Chase, HSBC Mortgage Corporation, U.S.A., Home Capital Funding, and MortgageIt, Inc. acted as Servicers in the conspiracy.

179.   For the purpose of forming and effectuating this conspiracy, Defendants and co-

35

conspirators did the following things, among others:

a.      The Defendants acting as Lenders described above systematically and repeatedly violated Federal and state lending laws in order to originate mortgages, as described in the previous claims for relief;

b.      The Defendants acting as Securitizers knowingly and by agreement purchased the unlawfully obtained mortgages from the Lenders;

c.      The Defendants acting as Lenders, Securitizers and Servicers utilized and benefited from the MERS system as a means of preventing detection by law enforcement or by the public and as a means of unlawful foreclosure to the detriment of homeowners;

d.      The Defendants acting as Lenders and Securitizers, with knowledge and agreement of the co-conspirators, utilized the MERS system in such a manner as to split the promissory note from the mortgage or deed of trust and thereby destroy the note holders' security, nevertheless proceeding with unlawful foreclosure actions to the detriment of homeowners;

e.      All Defendants named herein as co-conspirators profited from their respective roles in originating loans, selling them, and pooling their MERS registered home loans together in large bundles that were sold and turned into financial derivative instruments;

f.      The mortgage securitization process became known in financial industry parlance as "slicing and dicing." The slicing and dicing results in a pool of mortgages which have lost their individual characteristics but which have a high value to those who create them;

g.      The Defendants acting as Securitizers named herein purchased mortgages from the Defendants acting as Lenders named herein for securitization;

h.      The Defendants named as Securitizers herein sold the securitized and pooled mortgages as asset backed financial derivatives with affirmative claims that Defendants were unaware of any legal issues which would affect the value of the assets backing the securities, which was untrue, as Defendants actually knew or should have known that the mortgages were unlawfully obtained and subject to rescission, and knew or should have known that the mortgages and promissory notes had been split and therefore the note holder no longer had the right to foreclose, assuming that it ever did;

**FIRST AMENDED CLASS ACTION COMPLAINT**

i.    The Defendants described herein as Servicers unlawfully foreclosed on homeowners' properties.  The Servicers misrepresented that they had legal right to foreclose, when, in fact, they did not.  The Servicers' foreclosures illegally deprived homeowners of property;

j.    All Defendants named as MERS members agreed to promote MERS, an ostensibly lawful business, and to utilize MERS in an unlawful manner to deprive Plaintiffs and those similarly situated of property.

180.    The securitization process took distinct loans, deeds of trust, and mortgages, and pooled them together in such a manner that they lost their unique identity.  Hundreds of such financial derivative instruments were created by the co-conspirator Defendants.  The co-conspirators all profited from their respective roles in the process, including, but not limited to, the following pooling agreements:

a.    Defendant and co-conspirator Wells Fargo Bank, N.A. is the master servicer of the HSI Asset Loan Obligation Trust 2007-2.  Approximately 18% of the mortgages in that loan pool were originated by Defendant Countrywide Home Loans, Inc.  Approximately 26% of the mortgages in that pool originated from HSBC Mortgage Corporation (USA).  HSBC Mortgage Corporation (USA) profited from packaging its loans together with those of Defendant and co-conspirator Countrywide Home Loans, Inc.

b.    The HSI Asset Loan Obligation Trust 2006-2, was sponsored and sold by HSBC Bank.  Countrywide Home Loans, Inc. originated 13% of the loans in this instrument.  HSBC Mortgage Corporation (USA) originated 15% of the loans in this instrument.  HSBC Mortgage Corporation (USA) is one of the servicers of this financial derivative instrument.

c.    The Banc of America Funding 2007-4 Trust was sponsored by Defendant and co-conspirator Bank of America, N.A.  The Master Servicer of this financial derivative instrument is Defendant and co-conspirator Wells Fargo Bank, N.A.  GMAC Mortgage, L.L.C. and America's Servicing Company are also among the servicers.  The originators of the loans pooled in this instrument include Defendants and co-conspirators GMAC Mortgage, L.L.C., Countrywide Home Loans, Inc., Wells Fargo Bank, N.A., Bank of America, N.A., National City Mortgage Co.

37

**FIRST AMENDED CLASS ACTION COMPLAINT**

1       d.     The Banc of America Funding 2007-7 Trust was sponsored by Defendant and co-

2 conspirator Bank of America, N.A.  The Master Servicer of this financial derivative instrument is

3 Defendant and co-conspirator Wells Fargo Bank, N.A.  GMAC Mortgage, L.L.C. and America's

4 Servicing Company are also among the servicers.  The originators of the loans pooled in this

5 instrument include Defendants and co-conspirators GMAC Mortgage, L.L.C., Countrywide

6 Home Loans, Inc., Wells Fargo Bank, N.A., Bank of America, N.A., National City Mortgage Co.

7 The Banc of America Funding 2007-7 Trust hired Defendants and co-conspirators Bank of

8 America, N.A., CitiMortgage, Inc., GMAC Mortgage, LLC, and National City Mortgage Co. as

9 servicers.

10       e.     National City Mortgage Corporation is an originator and servicer of loans in the

11 GSAA Home Equity Trust Series 2007-8.  Wells Fargo Bank, N.A. and America's Servicing

12 Company are also servicers.  In the prospectus, National City Mortgage is described as a division

13 of National City Bank.

14       f.     In the Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through

15 Certificates, Series 2007-6, Defendant GE Money Bank was one of the major underwriters of the

16 loans which were pooled.  Defendant and Co-conspirator U.S. Bank, N.A. was also an originator

17 of loans in the pool.  U.S. Bank, N.A. is also a servicer.  U.S. Bank National Association and

18 Wells Fargo Bank, N.A. were hired as custodians of the trust.

19       g.     Defendant and co-conspirator Wells Fargo Bank, N.A. is the master servicer of the

20 HSI Asset Loan Obligation Trust 2007-2.  18% of the mortgages in that loan pool were originated

21 by Defendant Countrywide Home Loans, Inc.  26% of the mortgages in that pool originated from

22 HSBC Mortgage Corporation (USA).   HSBC Mortgage Corporation (USA) profited from

23 packaging its loans together with those of Defendant and co-conspirator Countrywide Home

24 Loans, Inc.

25       h.     In the J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Chase Bank was

26 an originator of loans that were pooled.  J.P. Morgan Chase Bank, National Association is one of

27 the servicers of the mortgage pool.  Wells Fargo Bank, N.A. is the master servicer.  U.S. Bank

28 National Association is the trustee.  Countrywide Home Loans, Inc. sold loans to the trust.  J.P.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  Morgan Chase Bank and America's Servicing Company are two of the servicers.

2  181.   Upon information and belief, Plaintiffs' loans were securitized, "sliced and diced"

3  and pooled into mortgage pools such as the ones described herein as part of the conspiracy related

4  to the creation and operation of the MERS system, and Defendants, and each of them, profited

5  from same and are liable for their acts and the acts of their co-conspirators in creating the MERS

6  system, including, but not limited to, the use of MERS-approved and created documents to

7  establish the loans (including, but not limited to, the form of deed of trust), and in participating in

8  the securitization process described herein.

9  182.   Upon information and belief, Defendant conspirators utilized funds received as

10  part of the Troubled Asset Relief Program payouts to further the conspiracy to defraud Plaintiffs,

11  and others similarly situated, to deprive them of their money, to deprive them of their property, to

12  unlawfully foreclose on loans made to putative class members, to pay investors in the mortgage-

13  backed securities which were comprised of the loans made to Plaintiffs and others similarly

14  situated, and to pay bonuses to employees and officers of the Defendant conspirators based on

15  their devising the subprime mortgage-backed products which were securitized by loans of the

16  type issued to Plaintiffs and others similarly situated, and collateralizing and selling such

17  products in the United States and abroad.

18  183.   As a result of Defendant conspirators' conspiracy described herein, Plaintiffs have

19  suffered injuries which include mental anguish, emotional distress, embarrassment, humiliation,

20  loss of reputation and a decreased credit rating which has, or will, impair Plaintiffs' ability to

21  obtain credit at a more favorable rate than before the decrease in credit rating, the loss or

22  anticipated loss of their Residences and other financial losses according to proof, and Plaintiffs

23  have incurred attorneys' fees and costs in this matter.

24  184.   Defendant conspirators' actions were wanton, willful and reckless, and justify an

25  award of punitive damages against Defendant conspirators, and each of them.

26

27  **EIGHTH CLAIM FOR RELIEF**

28  **(Unjust Enrichment)**
    **(As to All Defendants)**

39

**FIRST AMENDED CLASS ACTION COMPLAINT**

185.   Plaintiffs incorporate by this reference and reallege the allegations contained in paragraphs 1 through 184 above as if set forth fully herein.

186.   Defendant's deceptive scheme as alleged herein unjustly enriched Defendants, and each of them, to the detriment of Plaintiffs, and similarly situated class members, by causing Defendants, and each of them, to receive excessive monetary payments from Plaintiffs and the class members.

187.   Specifically, Plaintiffs and class members have been injured in their business or property in a variety of ways, including but not limited to:  All borrowers who were targeted for and lured into the mortgages sold by Defendants Countrywide Home Loans, Inc., Home Capital Funding, and MortgageIt, Inc. were handicapped in understanding the terms of those loans due to, *inter alia,* the failure to translate the documents or disclosures into English. This constituted a misrepresentation that caused Plaintiffs to pay more or less each month than Plaintiffs had been told would be due, or which was due as calculated per the terms of the First Note.  Moreover, upon information and belief, the variety of additional and separate payments charged for services and other items tangential to the loan were prohibitive.  The result is that Plaintiffs, and each class member, assumed financial burdens that they would not otherwise have assumed, and paid Defendants more than they justly should have owed.

188.   The loans made to Plaintiffs and to each class member were then repackaged, reassigned, and/or resold, each with a margin of profit for the assignee/buyer that would not otherwise have existed had Plaintiffs and all other members of the class not been deceived by the original terms of the loan and/or the lack of disclosures as alleged herein.

189.   Plaintiffs (and each class member) have paid or continues to pay an inflated interest rate that, upon information and belief, would not have been agreed to but for the failure to translate the documents and otherwise disclose the true terms and costs of the loans, tangential services, and out-of-pocket costs.

190.   Upon information and belief, Defendants, and each of them, retained and continue to retain these ongoing and escalating profits to the detriment of Plaintiffs and each class member, contrary to the fundamental principals of fairness, justice, and good conscience.

Amended complaint

**FIRST AMENDED CLASS ACTION COMPLAINT**

191.   Accordingly, Defendants, and each of them, should be ordered to return all funds obtained as a result of their deceptive scheme to Plaintiffs and class members.

## NINTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)
**(As to Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc.)**

192.   Plaintiffs incorporate by this reference and reallege the allegations contained in paragraphs 1 through 191 above as if set forth fully herein.

193.   Defendant's actions in targeting Plaintiffs for a loan, misrepresenting the terms and conditions of the loan, negotiating the loan, and closing the loan as alleged herein were intentional and/or reckless, wanton, and willful.

194.   Defendants' actions as alleged herein were extreme and outrageous because of the Plaintiffs' vulnerability to the predatory lending practices described above and because the subject of the loan was each Plaintiff's primary residence, inherent with the characteristics of providing shelter for each Plaintiff and providing each Plaintiff with a sense of pride and emotional security.

195.   As a result of Defendants' actions alleged herein, Plaintiff have suffered financial losses and the stress inherent with facing the loss of the Residence, embarrassment, and humiliation resulting from Plaintiffs' being put in the position of potentially defaulting on the loan, and all of these factors have culminated to invade Plaintiffs' mental and emotional tranquility and to cause Plaintiffs, and each class member, severe emotional distress that resulted in, *inter alia,* sleeplessness, and headaches.

196.   Because of the extreme and outrageous nature of Defendants' actions as alleged herein, and to deter such conduct in the future, Plaintiffs are entitled to an award of punitive damages.

## TENTH CLAIM FOR RELIEF

### (Fraud in the Inducement)
**(Against Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and MortgageIt, Inc.)**

41

1    197.    Plaintiffs incorporate by this reference and reallege the allegations contained in

2    paragraphs 1 through 196 above as if set forth fully herein.

3    198.    Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender,

4    Home Capital Funding, and MortgageIt, Inc., respectively, through their agents, failed to disclose

5    the material terms of the loans and incidental Services to Plaintiffs Vargas, Villalva and Martinez,

6    respectively, and others similarly situated, by, *inter alia,* failing to explain the fact that Plaintiffs

7    and others similarly situated were not qualified to enter the loans on the terms stated, and/or

8    failing to translate the pertinent documents into Spanish or such other native language applicable

9    to the class members.

10    199.    Defendants concealed the true terms of the loans, and the risks of the transactions,

11    including, but not limited to, negative amortization, prepayment penalty provisions, the risk of

12    default and the risk of foreclosure, from Plaintiffs and similarly situated class members.

13    200.    Defendants misrepresented the ability of Plaintiffs, and others similarly situated, to

14    qualify for the loans.

15    201.    Defendants knew or should have known that had the truth been disclosed,

16    Plaintiffs and others similarly situated would not have entered into the loans.

17    202.    Defendants intended to induce Plaintiffs and similarly situated class members'

18    reliance on these representations, failures to disclose and failures to translate the documents.

19    203.    Plaintiffs and similarly situated class members reasonably relied upon the

20    misrepresentations to their detriment, particularly in light of their inability to read, understand,

21    and therefore discern, those misrepresentations that conflicted with the terms of the transaction.

22    204.    But for the failure to translate or otherwise disclose the true and material terms of

23    the transaction, Plaintiffs and similarly situated class members could have read the agreements

24    and additional documents and would have been alerted to issues of concern.   Defendants'

25    intentional misrepresentations, and the failure to translate or otherwise disclose the material terms

26    of the transaction, induced Plaintiffs and similarly situated class members to enter into the loans

27    and accept the Services as alleged herein.

28

42

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   205.   As a direct and proximate result of the failure to translate and/or disclose, and the

2   misrepresentations, Plaintiffs and similarly situated class members were damaged in an amount to

3   be proven at trial, including but not limited to, increased interest rates, damage to their credit

4   ratings and financial security, emotional distress, headaches, sleeplessness, the inability to

5   refinance their homes as necessary, and Plaintiffs have incurred costs and attorney's fees.

6   **ELEVENTH CLAIM FOR RELIEF - INJUNCTIVE RELIEF**

7   206.   Plaintiffs incorporate by this reference and reallege the allegations contained in

8   paragraphs 1 through 205 above as if set forth fully herein.

9   207.   On or about February 19, 2009, Plaintiff Vargas received notification from

10   Defendant Countrywide Home Loans, Inc. dba America's Wholesale Lender that if Plaintiff did

11   not bring the payments on the loans current, Defendant would institute foreclosure proceedings.

12   208.   Plaintiff has been unable to bring the payments current.

13   209.   Plaintiff Vargas is faced with a clear and present danger of the loss of the

14   Residence due to the threatened foreclosure action related to Plaintiff's Residence.

15   210.   Plaintiff Vargas will suffer irreparable harm if Defendants are not enjoined from

16   advancing any foreclosure action as to Plaintiff's Residence, as Plaintiff will lose Plaintiff's

17   interest in, and possession of, the Residence, which is Plaintiff's primary dwelling and is unique,

18   and Plaintiff will have no adequate remedy at law.

19   211.   Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender and

20   MERS, Inc., listed as the beneficiary under the First and Second Deed of Trust, have no

21   investment in the Residence, as the Notes on the Residence were transferred as alleged in the

22   Seventh Claim for Relief above, and, therefore, Defendants will not suffer irreparable harm if the

23   foreclosure action is enjoined.

24   212.   Plaintiff Vargas is entitled to a temporary restraining order and a preliminary and

25   permanent injunction prohibiting Defendants Countrywide Home Loans, Inc. dba America's

26   Wholesale Lender and MERS, and their officers, agents, employees, servants, and attorneys, and

27   those persons in active concert or participation with any of them or each of them, from advancing

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

Amended complaint

1   any foreclosure action as to Plaintiff's Residence, or otherwise interfering with Plaintiff's

2   peaceful use and enjoyment of the Residence.

3       213.   Plaintiff has been required to retain counsel in this matter to protect Plaintiff's

4   rights and has incurred attorneys' fees and costs in this matter.

5   **TWELFTH CLAIM FOR RELIEF – DECLARATORY RELIEF**

6       214.   Plaintiffs incorporate by this reference and reallege the allegations contained in

7   paragraphs 1 through 213 above as if set forth fully herein.

8       215.   As alleged in Plaintiffs' claims regarding the Defendants' violations of the Truth

9   In Lending Act, the Home Ownership and Equity Protection Act, the Fair Housing Act, the

10   California Translation Act, and the California Business & Professions Code, Defendants

11   Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and

12   MortgageIt, Inc. have violated Plaintiffs' rights under federal and state law.

13       216.   Plaintiffs seek a declaratory judgment against Defendants stating that Defendants

14   violated Plaintiffs' rights under the Truth in Lending Act, the Home Ownership and Equity

15   Protection Act, the Fair Housing Act, the California Translation Act, and the California Business

16   & Professions Code.

17       217.   Plaintiffs have been required to retain counsel in this matter to protect Plaintiffs'

18   rights and have incurred attorneys' fees and costs in this matter.

19   **THIRTEENTH CLAIM FOR RELIEF**
20   **(Class Action Claim for Violation of California Business and Professions Code § 17200)**
     **(Against Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender,**
21   **Home Capital Funding and MortgageIt, Inc.)**

22       218.   Plaintiffs incorporate by this reference and reallege the allegations contained in

23   paragraphs 1 through 217 above as if set forth fully herein.

24       219.   Plaintiffs make this representative claim on behalf of themselves and the other

25   class members under the California Business & Professions Code § 17200 (also referred to as the

26   Unfair Competition Law or "UCL") in order to seek:

27       A.   Such orders or judgments to or against Defendants, and/or its agents, as

28   may be necessary to prevent or discourage the continued practice by lenders and/or brokers in

**FIRST AMENDED CLASS ACTION COMPLAINT**

Amended complaint

1   their capacity as agents for Countrywide Home Loans, Inc., Home Capital Funding, or

2   MortgageIt, Inc. of engaging in loans and related services without adherence to the translation

3   requirement of California Translation Act, a practice constituting unlawful and unfair competition

4   within the meaning of the UCL and for which Defendants and their agents are responsible.

5              B.       Such orders or judgments to or against Defendants, and/or their agents, as

6   necessary to restore to each member of the plaintiff class any money or property, real or personal,

7   which may have been acquired by means of unfair competition.

8       220.   Upon information and belief, the practice of providing loan documents in English

9   only is widespread and has contributed to the sub-prime and other mortgage problems, including

10  foreclosures, suffered in California and elsewhere.

11      221.   Per California Business and Professions Code § 17203, Vargas, Villalva, and

12  Martinez and all other class members meet the standing requirements of California Business and

13  Professions Code § 17204, in that each person has suffered injury in fact as a result of the unfair

14  business practices alleged herein.

15      222.   Per California Business and Professions Code § 17203, Vargas, Villalva and

16  Martinez are complying with the requirements of California Code of Civil Procedure § 382.

17      223.   Upon information and belief, failure by lenders to comply with the Translation Act

18  is widespread.  As an indirect result of the orders prayed for in this complaint, a general

19  adherence by the lending institutions in California can be expected, all to the benefit of the

20  general public, as well as to members of the Plaintiff class.

21      224.   As generally authorized by California Business and Professions Code §§ 17203

22  and 17205, the Plaintiff Class is entitled to the following relief from Defendants:

23              A.       A declaratory judgment that Defendants had a duty to under the

24  Translation Act to provide all loan documents, including disclosures, in Spanish or such other

25  language that could be reasonably understood by Plaintiff Class Members, and that Defendants

26  failed to meet that duty, and that Countrywide Home Loans, Inc., Home Capital Funding, and

27  MortgageIt, Inc. are secondarily liable to the members of the Plaintiff Class for the failure of their

28  agents to abide by the requirements of the Translation Act.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1         B.     An affirmative injunction ordering Countrywide Home Loans, Inc., Home

2 Capital Funding, and MortgageIt, Inc. and/or their successors-in-interest to notify all persons who

3 took out loans of the type described herein, in English, Spanish, Chinese, Tagalog, Vietnamese

4 and Korean, that the failure to abide by the Translation Act requirements occurred and that, if the

5 person so notified is a member of the Plaintiff Class, the person may be eligible to rescind the

6 loan contract, whether or not the loan has been reassigned.  Further, such injunction should

7 mandate that Defendants are to include with such notification that any person who believes they

8 are a class member may receive from Defendants (and/or their successor in interest) the

9 appropriate translation promptly upon notice to Defendants;

10         C.     Penalties pursuant to California Business and Professions Code § 17206;

11         D.     Restitution; and

12         E.     Attorney's fees, as authorized by California Code of Civil Procedure §

13 1021.5, in an amount to be determined.

### CLASS ACTION ALLEGATIONS AND
### REQUEST FOR CLASS CERTIFICATION

16     225.    Plaintiffs incorporate by this reference and reallege the allegations contained in

17 paragraphs 1 through 224 above as if set forth fully herein.

### Class Definition

19     226.    Plaintiffs, pursuant to Fed. R. Civ. P. 23(a), (b)(2-3), bring this action on behalf of

20 a similarly situated class of individuals under the provisions of federal and state laws regarding

21 plaintiff class actions.  The class is composed of Plaintiffs and others in the state of California and

22 in the United States whose residential real estate loans were originated, funded, serviced,

23 securitized, sold, transferred, insured, or guaranteed by Defendants between January 2006 and

24 present, and who were damaged or face risk of damage by the origination, servicing, sale,

25 transfer, foreclosure, and/or acquisition of such loans.  Excluded from the class are the

26 Defendants, including any parent, subsidiary, affiliate or controlled person of the Defendants and

27 their officers, directors, agents or employees, any judge or judicial officer assigned to this matter,

28 and members of the immediate families of any excluded persons.

46

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Numerosity**

227.   Upon information and belief, Plaintiff estimates that the class comprises not less than 225 individual members and the class is so numerous that joinder of all members is impracticable.   The members of the class can be identified and located using information contained in the Defendants' mortgage lending records.

**Common Questions of Law and/or Fact**

228.   There are common questions of law and/or fact common to the class, including whether the Defendants Countrywide Home Loans, Inc. dba America's Wholesale Lender, Home Capital Funding, and/or MortgageIt, Inc. violated the Truth in Lending Act, the Home Ownership and Equity Protection Act, the Federal Fair Housing Act, the California Translation Act and the California Business and Professions Code, as alleged herein, whether any such violations constituted a conspiracy to commit fraud or conversion and/or whether Defendants' conduct constitutes intentional infliction of emotional distress on the class members.   Also common to the class is the issue of whether the named Defendants acted as conspirators in committing fraud in creating the MERS system as alleged herein.

**Typicality**

229.   Plaintiffs' claims are typical of those of the members of the class.   Plaintiffs and the class members were subjected to the same kind of unlawful conduct and the claims of Plaintiffs and the class members are based on the same legal theories.

**Fair and Adequate Representation of Class**

230.   Plaintiffs will fairly and adequately protect the interests of the class Plaintiffs represent.   Plaintiffs' interests do not conflict with the interests of the class, and Plaintiffs intend on prosecuting this action vigorously.

231.   Plaintiffs have retained experienced counsel qualified in class litigation and counsel are competent to assert the interests of the class.

**Rule 23(b) Requirements**

232.   The unlawful acts of Defendants, as alleged herein, constitute a course of conduct common to Plaintiffs and each class member.   Prosecution of separate actions by individual class

47

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   members would create a risk of inconsistent or varying adjudications which would establish

2   incompatible standards of conduct for Defendants and/or substantially impair or impeded the

3   ability of the individual class members to protect their interests.

4       233.   Injunctive and/or declaratory relief to the class is appropriate because, upon

5   information and belief, Defendants, and each of them, have acted or refused to act on grounds

6   generally applicable to the class.

7       234.   Questions of law and/or fact common to the class members, including the issues

8   identified above, predominate over questions affecting only individual class members, and a class

9   action is superior to other available methods for fair and efficient adjudication of the controversy.

10  Class action treatment will allow a large number of similarly situated individuals to

11  simultaneously pursue their common claims in a single forum in an efficient manner, without

12  unnecessary duplication of effort and expense that would be required if numerous individual

13  actions were pursued.

14      WHEREFORE, Plaintiffs pray this court enter an order providing relief as follows:

15      1.    For award of damages against Defendants and each of them on Plaintiffs'

16          claims as applicable under federal law as alleged above in an amount to be

17          shown at trial;

18      2.    For an award of damages against Defendants, and each of them, on the

19          Plaintiffs' state law claims, whether general, special or punitive as alleged

20          above, in an amount to be shown at trial;

21      3.    For an award of treble damages pursuant to California Business &

22          Professions Code § 17082;

23      4.    For an award of attorneys' fees and costs as provided by law;

24      5.    For an order of rescission on behalf of named Plaintiffs under the

25          California Translation Act;

26      6.    For an order of restitution on behalf of Plaintiffs and class members under

27          the California Business & Professions Code;

28      7.    For an award of penalties on behalf of the class members under the

FIRST AMENDED CLASS ACTION COMPLAINT

1 California Business & Professions Code;

2 8. For a temporary restraining order and preliminary and permanent

3 injunction prohibiting Defendants Countrywide Home Loans, Inc. and

4 MERS, and their officers, agents, employees, servants, and attorneys, and

5 those persons in active concert or participation with any of them or each of

6 them, as specifically alleged above from proceeding with any foreclosure

7 action as to Plaintiff Vargas' residence or proceeding with any collection

8 action against the Plaintiff and from proceeding with foreclosure actions

9 against the residences of similarly situated class members;

10 9. For a declaratory judgment holding that Plaintiffs' rights were violated as

11 alleged above;

12 10. That Plaintiffs have and recover from the Defendants pre-judgment interest

13 as may be determined by statute and rule;

14 11. That this action be certified as a Plaintiffs' class action: and

15 12. Pursuant to Federal Rules of Civil Procedure, Rule 38, Plaintiffs demand a

16 trial by jury on all issues of fact in this action; and

17 13. That this Court grant such other and further relief as it deems just and

18 proper.

19

20 DATED: July 24, 2009                    KOELLER, NEBEKER, CARLSON &
                                         HALUCK, LLP
21

22

23 /s/ Sharon A. Huerta
                                         William A. Nebeker, Esq.
24 Sharon A. Huerta, Esq.
                                         *Attorneys for Plaintiffs*

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2

  Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury to the fullest

3

extent permitted by law.

4

5

DATED: July 24, 2009         KOELLER, NEBEKER, CARLSON &
                  HALUCK, LLP

6

7

                  */s/ Sharon A. Huerta*

8

                  William A. Nebeker, Esq.
                  Sharon A. Huerta, Esq.

9

                  *Attorneys for Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

# EXHIBIT 1

Prepared by: DEBRA GURROLA

LOAN #: 124710511

# ADJUSTABLE RATE NOTE
### (MTA - Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

JANUARY 12, 2006                    SAN BERNARDINO                    CALIFORNIA
[Date]                                      [City]                              [State]

2222 LAUREL AVE, POMONA, CA 91768-1120
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $ 308,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed          115 percent of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is AMERICA'S WHOLESALE LENDER
I will make all payments under this Note in the form of cash, check or money order.
    I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
    **(A)   Interest Rate**
    Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first monthly payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of          7.250 %.  Additional days interest collected prior to the first monthly payment due date is sometimes called "Per Diem" interest and is due at the time I close my loan. Thereafter until the first Interest Rate Change Date, defined below in Section 2(B), I will pay interest at a yearly rate of          1.500 %. This rate is sometimes referred to as the "Start Rate" and is used to calculate the initial monthly payment described in Section 3. The interest rate required by this Section 2 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

    **(B)   Interest Rate Change Dates**
    The interest rate I will pay may change on the **first**          day of MARCH, 2006          , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

    **(C)   Index**
    Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".
    If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

    **(D)   Calculation of Interest Rate Changes**
    Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE & 575/1000          percentage point(s)          3.575 ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than          9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**
    **(A)   Time and Place of Payments**
    I will make a payment every month.
    I will make my monthly payments on the **first**          day of each month beginning on MARCH 01, 2006          . I will make these payments every month until I have paid all the Principal and interest and any

● PayOption ARM Note - MTA Index
2E306-XX (09/05)(d)                    Page 1 of 4





LOAN #: 124710511

other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   FEBRUARY 01, 2036   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219 .
or at a different place if required by the Note Holder.

### (B)  Amount of My Initial Monthly Payments
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,062.97                , unless adjusted under Section 3(F).

### (C)  Payment Change Dates
My monthly payment may change as required by Section 3(D) below beginning on the first                     day of MARCH, 2007           , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D)  Calculation of Monthly Payment Changes
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than   7.500% of my prior monthly payment. This 7.500% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number   1.075 . The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

### (E)  Additions to My Unpaid Principal ;
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F)  Limit on My Unpaid Principal; Increased Monthly Payment
My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN           percent (    115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

### (G)  Required Full Payment
On the tenth             Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

### (H)  Payment Options
After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." The Payment Options are calculated using the new interest rate in accordance with Section 2(D). I may be given the following Payment Options:

(i)   Interest Only Payment:  the amount that would pay the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   Amortized Payment:  the amount necessary to pay the loan off (Principal and interest) at the Maturity Date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

(iii)   15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

LOAN #: 124710511

These Payment Options are only applicable if they are greater than the Minimum Payment.

**4.  NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any Minimum Payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.000 % of the Minimum Payment. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each Minimum Payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the Minimum Payment by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

LOAN #: 124710511

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____   - Borrower
ALFONSO J. VARGAS

_____   - Borrower

_____   - Borrower

_____   - Borrower

Prepared by: DEBRA GURROLA

**AMERICA'S WHOLESALE LENDER**

DATE:          01/12/2006
BORROWER: ALFONSO J. VARGAS
CASE #:
LOAN #:     124710511
PROPERTY ADDRESS:2222 LAUREL AVE
                 POMONA, CA 91768-1120

Branch #: 0000775
1455 FRAZEE ROAD #102
SAN DIEGO, CA 92108
Phone: (619) 688-5100
Br Fax No.: (619) 688-9258

# PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated   JANUARY 12, 2006          , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by me to
AMERICA'S WHOLESALE LENDER
(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first THIRTY SIX months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment.

● Multistate Prepayment Penalty Addendum
1E296-XX (01/05)(d)

Page 1 of 2





All other terms and conditions of the above referenced Note remain in full force and effect.

_____

ALFONSO J. VARGAS                                          Borrower

_____

                                                          Borrower

_____

                                                          Borrower

_____

                                                          Borrower

Recording Requested By:
J. FOX


After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
DEBRA GURROLA

———————————————— [Space Above This Line For Recording Data] ————————————————

| 14094280303TMM | 00012471051101006 |
|---|---|
| [Escrow/Closing #] | [Doc ID #] |

# DEED OF TRUST

MIN 1000157-0006319501-6

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JANUARY 12, 2006 , together with all Riders to this document.

(B) "Borrower" is
ALFONSO J VARGAS, A MARRIED MAN AS HIS SOLE & SEPARATE PROPERTY


CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 16

-6A(CA) (0207) CHL (08/05)(d) VMP Mortgage Solutions, Inc. (800)521-7291     Form 3005 1/01
CONV/VA





DOC ID #: 00012471051101006

Borrower's address is
2222 LAUREL AVE, POMONA, CA 91768-1120
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613
(D) "Trustee" is
ReconTrust Company, N.A
225 West Hillcrest Dr., MSN TO-02, Thousand Oaks, CA 91360
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated  JANUARY 12, 2006    . The
Note states that Borrower owes Lender
THREE HUNDRED EIGHT THOUSAND and 00/100

Dollars (U.S. $ 308,000.00      ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  FEBRUARY 01, 2036   .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners association
or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage
to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

DOC ID #: 00012471051101006

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of LOS ANGELES :

[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

LOT 29, OF TRACT NO. 17801, IN THE CITY OF POMONA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 437, PAGE(S) 37 TO 41 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. EXCEPT THEREFROM ALL OIL, GAS, MINERALS, AND OTHER HYDROCARBONS, BUT WITHOUT THE RIGHT OF SURFACE ENTRY THEREON, AS RESERVED IN INSTRUMENTS OF RECORD. APN NO: 8354-030-017

Parcel ID Number: 8354030017                           which currently has the address of

2222 LAUREL AVE, POMONA
[Street/City]

California 91768-1120 ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

DOC ID #: 00012471051101006

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

DOC ID #: 00012471051101006

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

DOC ID #: 0001247105110106

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

DOC ID #: 00012471051101006

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

DOC ID #: 00012471051101006

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

DOC ID #: 00012471051101006

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

DOC ID #: 00012471051101006

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

DOC ID #: 00012471051101006

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

DOC ID #: 0001247105110 1006

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

DOC ID #: 00012471051101006

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

DOC ID #: 00012471051101006

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

DOC ID #: 00012471051101006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ALFONSO J. VARGAS                         -Borrower

_____ (Seal)
                                          -Borrower

_____ (Seal)
                                          -Borrower

_____ (Seal)
                                          -Borrower

DOC ID #: 00012471051101006

State of California
County of                                                    } ss.

On _____, _____ before me, _____

_____ personally appeared

_____

_____

_____

_____

_____

_____ , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


_____ (Seal)

# ADJUSTABLE RATE RIDER
### (PayOption MTA Twelve Month Average Index - Payment Caps)

14094280303TMM          0001247105110 1006
[Escrow/Closing #]          [Doc ID #]

THIS ADJUSTABLE RATE RIDER is made this TWELFTH          day of
JANUARY, 2006     , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
AMERICA'S WHOLESALE LENDER

("Lender") of the same date and covering the property described in the Security Instrument and
located at:

2222 LAUREL AVE
POMONA, CA, 91768-1120
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE
MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY
PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD
BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE
MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

* **PayOption MTA ARM Rider**
**1E310-XX (09/05)(d)**          Page 1 of 6





DOC ID #: 0001247105110

## 2. INTEREST

**(A)  Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first monthly payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of      7.250 %. Additional days interest collected prior to the first monthly payment due date is sometimes called "Per Diem" interest and is due at the time I close my loan. Thereafter until the first Interest Rate Change Date, defined below in Section 2(B), I will pay interest at a yearly rate of      1.500 %. This rate is sometimes referred to as the "Start Rate" and is used to calculate the initial monthly payment described in Section 3.  The interest rate required by this Section 2 of the Note is the rate I will pay both before and after any default described in Section 7(B) of the Note.

**(B)  Interest Rate Change Dates**

The interest rate I will pay may change on the first             day of MARCH, 2006            , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C)  Index**

Beginning with the first Interst Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)  Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding              THREE & 575/1000 percentage point(s) (     3.575 %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than      9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

**•  PayOption MTA ARM Rider**
**1E310-XX (09/05)**                    Page 2 of 6

DOC ID #: 0001247105110006

I will make my monthly payments on the FIRST            day of each month beginning on March, 2006                 . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  FEBRUARY 01, 2036     , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,062.97                       , unless adjusted under Section 3 (F).

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first            day of MARCH, 2007                  , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)   Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than   7.500%  of my prior monthly payment. This   7.500%  limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number   1.075 . The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment.

* **PayOption MTA ARM Rider**
**1E310-XX (09/05)**                    Page 3 of 6

DOC ID #: 00012471051101006

### (E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN percent ( 115 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my Minimum Payment would cause me to exceed that limit, I will instead pay a new Minimum Payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

### (G) Required Full Payment

On the tenth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

### (H) Payment Options

After the first Interest Rate Change Date, the Note Holder may provide me with up to three (3) additional payment options that are **greater** than the Minimum Payment, which are called "Payment Options." The Payment Options are calculated using the new interest rate in accordance with Section 2(D). I may be given the following Payment Options:

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

**PayOption MTA ARM Rider**
**1E310-XX (09/05)**                    Page 4 of 6

DOC ID #: 00012471051101006

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by